### In the Matter of the EXTRADITION OF Emilio Valdez MAINERO, aka Ricardo Gonzalez Leon, Ricardo Emilio Valdez-Mainero and Emilio Ricardo Valdez.

### No. 96MG1798 (AJB).

United States District Court, S.D. California.

Dec. 19, 1997.

Michael Pancer, Law Office of Michel Pancer, San Diego, CA, for Emilio Ricardo Valdez.

### Findings of Fact, Conclusions of Law and Certification of Extraditability

BATTAGLIA, United States Magistrate Judge.

In the proceeding before this Court, the Republic of Mexico (hereafter Mexico), through the United States government, seeks the extradition of United States citizen, EMILIO VALDEZ MAINERO, alleged to have committed crimes in Mexico. The matter proceeded to an extradition hearing on June 30, 1997 before the Honorable Anthony J. Battaglia, United States Magistrate Judge.

The interests of Mexico were represented by the United States through the United States Department of Justice, by United States Attorney Alan D. Bersin and Assistant United States Attorney Gonzalo P. Curiel. EMILIO VALDEZ MAINERO was represented by retained counsel Michael Pancer.

The court, for reasons explained below, grants the petition, finding the detainee extraditable.

### Background

EMILIO VALDEZ MAINERO (hereinafter "Valdez" or "Respondent")[1] is accused by Mexico of having been involved with or committing various crimes in violation of Mexican laws. Pursuant to an extradition treaty between Mexico and the United States, Treaty 31 UST 5059, TIAS 9656 ("Treaty"), and under federal laws supplementing and implementing such treaties, 18 U.S.C. § 3184, *et seq.*, the United States issued a provisional arrest warrant for the Respondent, signed by Magistrate Judge Anthony J. Battaglia on September 30, 1996.[2] The warrant was issued on a Complaint charging Respondent with carrying a firearm exclusively reserved for the military in violation of Articles 160 and 162, paragraph 3, Criminal Code for the Federal District. This resulted in the arrest of Valdez on September 30, 1996. Valdez was ordered detained following arraignment. A Supplemental Complaint was filed and Respondent was arraigned thereon on October 16, 1996. The Supplemental Complaint charged Respondent with criminal association under Article 164, paragraph 1 and Article 13, section 2 of the Penal Code for the Federal District. Valdez moved the Court for release under the special circumstances doctrine. The Court denied the motion.[3]

The United States filed certified documents in support of the extradition request at various times, the first of which was on December 4, 1996. The certified documents included diplomatic note 001831 dated November 25, 1996 from the Embassy of Mexico formally requesting the extradition of Respondent on the firearms and conspiracy charges. Additional documentation[4] (specifically related to the first degree murder and carrying a firearm exclusive to the Army, Navy and Air Force) were submitted by diplomatic note No. 000012 dated January 3,

---

1. Valdez was identified or described at various times and by different persons or in documentary evidence with nicknames or aliases. Mr. Valdez was referred to as "El Cabezon", "C.P.", "El 5 Segundos", Ricardo Gonzalez Leon, Ricardo Emilio Valdez Mainero and Emilio Ricardo Valdez.

2. An analysis under *Parretti v. United States*, 112 F.3d 1363 (9th Cir.1997) decided May 6, 1997 and amended August 29, 1997, well after the issuance of the provisional arrest warrant in this case, is unnecessary given the timely filing of certified documents. The analysis is also unnecessary in light of the Ninth Circuit order of

October 2, 1997 ordering an en banc hearing in the case. 124 F.3d 1186, 1997 WL 624797 (9th Cir.).

3. See Memorandum Decision Denying Bail Pending Extradition Proceedings filed 10/21/96 (Docket No. 12). *In the Matter of Extradition of Emilio Valdez Mainero*, 950 F.Supp. 290 (S.D.Cal.1996).

4. As presented, the documentary evidence in this regard appears to supplement, not supersede, the previous filings of certified documents in support of the request for extradition. These issues were analyzed under that premise.

1997. The filing of certified documents permitted Mexico to go forward with the extradition proceeding under the Treaty. Prior to the June 30, 1997 evidentiary hearing on the extradition requests, there were numerous other filings by the United States and by counsel for the detainee as well as several status hearings.

On July 29, 1997, Respondent filed a Motion to Reopen Evidence in this matter. Specifically, Respondent sought "all witness statements .submitted in General Gutierrez Rebollo's case to determine whether or not there is additional relevant testimony." While the motion was denied, the Court did find good cause to order the production of further evidence described by the United States in its responsive papers as becoming available since the June 30, 1997 extradition hearing. Specifically, the Court ordered the United States to file copies of videotapes of Alejandro Hodoyan's deposition; evidence including Respondent's statements regarding the circumstances surrounding the 1997 abduction of Alejandro Hodoyan and the genesis of the March 3, 1997 declaration by Alejandro Hodoyan;[5] and, all statements, recordings, transcriptions and memoranda of interviews by the assistant U.S. Attorney and federal agents of Alejandro Hodoyan.[6] The Court also directed the United States to request from Mexico, a signed statement of Seargent Ruiz and evidence of all dates of arrest after September 1, 1996 of witnesses Soto, Alejandro Hodoyan, Francisco Cabrera Castro and Gerardo Cruz Pacheco.[7]

Mexico has filed the videotapes, the evidence concerning Respondent's statements regarding the 1997 abduction of Alejandro Hodoyan and the genesis of the March 3, 1997 Declaration by Alejandro Hodoyan, as well as the statements by Alejandro to U.S. agents. Mexico did not produce a signed statement of Sergeant Ruiz or evidence of dates of arrest of the referenced witnesses.[8] Additional written argument was entertained from counsel and submissions in this regard were completed on October 14, 1997. On October 22, 1997, the Court issued an Order directing the United States Attorney to produce photographic evidence referenced in witness statements and related to the issue of the identity of Respondent. The date of production for the photographic evidence was set for November 5, 1997 [9] and later extended with properly authenticated and certified originals being filed on December 1, 1997.

### Discussion

### Description of Alleged Offenses and Involvement of Respondent

The Republic of Mexico seeks to extradite Valdez to answer the following charges:

(1) Carrying a firearm exclusive to the Army, Navy and Air Force on or about April 9, 1996 in violation of Article 83, Section II, in accordance with Article 11, Section (b), of the Federal Law of Mexico on Weapons and Explosives;[10]

(2) Criminal Association between 1994 and September 14, 1996 in violation of Article 164, Paragraph 1 in accordance with Article 13, Section II, of the Penal Code for the Federal District;[11] and,

---

5. This Declaration is filed in Case No. 96–1828 M, in The Matter of the Extradition of Alejandro Hodoyan Palacios, Docket No. 33. The March 3, 1997 date is taken from the first line of the document.

6. See ORDER DENYING RESPONDENT'S MOTION TO REOPEN EVIDENCE AND DIRECTING THE UNITED STATES TO FILE ADDITIONAL EVIDENCE filed September 11, 1997 (Docket No. 39); and, SUPPLEMENTAL ORDER DIRECTING THE UNITED STATES TO FILE ADDITIONAL EVIDENCE filed September 12, 1997 (Docket No. 40).

7. See footnote 6.

8. See RESPONSE TO REQUEST FOR ADDITIONAL INFORMATION IN SUPPORT OF EX-

TRADITION filed September 29, 1997 (Docket No. 44).

9. See ORDER DIRECTING THE FILING OF ADDITIONAL EVIDENCE filed October 23, 1997 (Docket No. 50).

10. The firearms charge initially asserted by Mexico and related to the events on or about April 13, 1994 appears to have been abandoned. See Reply to Extraditees Response to Extradition Request and Request for Release, Page 8, lines 1–5, inclusive (Docket No. 28).

11. More fully identified as the "Criminal Code in local matters and for all the Republic in federal matters."

(3) First Degree Murder of Jesus Gallardo Vigil and Jesus Sanchez Angulo in violation of Article 302; Article 303, Sections I and III, Article 315 and Article 320 of the Penal Code for the Federal District.

It is alleged that Respondent was involved in criminal activities within the Arellano–Felix drug trafficking organization (hereinafter AFO). Respondent's role is alleged to have included, among other things, the planning and carrying out of assassinations of people perceived to be enemies of the AFO, including rival drug traffickers and law enforcement officials. It is also alleged that Respondent was in charge of cocaine and marijuana shipments for the AFO and as a leading member of the organization, was responsible for assigning code names to the other members.

Concerning the murder and firearms charge, it is alleged that on April 9, 1996, at approximately 9:30 p.m., in the restaurant at the Holiday Inn in Toluca, Mexico, Jesus Gallardo Vigil, aka "El Bebe", (hereinafter "Gallardo"), and Jesus Sanchez Angulo (hereinafter "Sanchez") were shot and killed by Respondent and Fabian Martinez Gonzalez, aka "Tiburon", (hereinafter "Martinez"). According to the allegations, earlier on April 9, 1996, Valdez, Martinez, and Isaac Contreras Ayala, aka "Calaco", (hereinafter "Contreras") were awaiting the arrival of Gerardo Cruz Pacheco, aka "Capitan", (hereinafter "Cruz") at the Glorieta del Angel. Valdez, Martinez and Contreras, were carrying small weapons in a white Volkswagen. Martinez instructed Contreras and Cruz to drive a navy blue Cutlass to the Holiday Inn in Toluca. The others drove in a white Volkswagen.

At approximately 9:00 p.m., the two cars arrived at the Holiday Inn, Toluca, Valdez and Martinez got out of the car. Valdez told Contreras, "Wait for me here and when you see us leave the parking lot in the white Volkswagen, make a wall so that we won't be followed".

At approximately 9:30 p.m. Valdez and Martinez encountered Gallardo whom Valdez planned to assassinate. Valdez shot and killed Gallardo as well as Sanchez who happened to be in the corridor at the time of Gallardo's murder.

Valdez and Martinez then fled the Holiday Inn in the white Volkswagen. The others in the navy blue Cutlass also left the Holiday Inn and caught up with the white Volkswagen at the village of San Mateo Atenco. There, Valdez told the group, " 'The Baby' paid me off. Nobody threatens my brother because the moron who does it, dies."[12]

### Treaty Requirements and Necessary Documentation

Under Article 10 of the Treaty, the request for extradition is required to contain the description of the offense for which extradition is requested and shall be accompanied by:

(1) A statement of the facts of the case;

(2) The text of the legal provisions describing the essential elements of the offense;

(3) The text of the legal provisions describing the punishment for the offense;

(4) The text of the legal provisions relating to the time limit on the prosecution of the offense; and,

(5) The facts and the personal information of the person sought which will permit his identification and, where possible, information concerning his location;

(6) A certified copy of the warrant of arrest issued by the judge or judicial officer [in Mexico]; and,

(7) Evidence which, in accordance with the laws of the requested party, would justify the apprehension and commitment for the trial of the person sought if the offense had been committed there, (i.e., probable cause).

Respondent does not dispute that the Treaty requirements have been met with regard to these items with three exceptions. As to item 7, the sufficiency of the evidence, Respondent contends that the probable cause element has not been met and, therefore, there is no justification for his apprehension and commitment for extradition to Mexico.

---

**12.** Statement of Gerardo Cruz Pacheco to an agent of the Federal Prosecutor on October 12, 1996.

The sufficiency of the evidence (i.e., probable cause) will be discussed hereinafter.

■ Respondent also challenges compliance with the Treaty, and urges his release in these proceedings, relative to the "late filing" of certified documents in this case. Specifically, Respondent asserts that evidence included in the second extradition packet should not be received or considered by the Court. No case authority is offered on this issue. This assertion relates specifically to the supplemental filing of evidence regarding the first degree murder charge on January 14, 1997 and the weapons charge related to the events and circumstances of April 9, 1996. In this regard, Respondent cites Article 11, Paragraph 3 of the Treaty. As described herein, the Court does find that the Republic of Mexico has met the documentary and timeliness requirements of the Treaty.

■ Respondent's reliance upon Article 11, Paragraph 3, is misplaced. Article 11, Paragraph 3, provides that the provisional arrest "shall be terminated" if the United States does not receive the formal request for extradition and the necessary documents specified in Article 10 within 60 days after the detainee's apprehension. The United States, in fact, complied with Article 11, Paragraph 3, by its initial filing of diplomatic note 001831, on November 25, 1996 with the U.S. Embassy in Mexico.[13] The diplomatic note related to the initial firearms charge[14] and the criminal association charge. After receipt of the diplomatic note, Respondent was then held under the formal request for extradition and not the provisional arrest which had initiated the case.[15] The later supplementation of the record and the supplementation of Mexico's request for extradition, with additional charges, are not inconsistent with the Treaty or its provisions. Respondent was afforded due process with a full opportunity to review and respond to the supplemental materials. The Extradition Hearing was continued on several occasions after the January 14, 1997 filing, with the consent of the parties, to allow for further preparation and response to the evidence. Ultimately, the United States sought to stay the proceedings for an additional ninety (90) day period. The government's request for the stay was *denied* sustaining Respondent's objection and request to proceed. As a result, the Court finds Treaty compliance in this respect and denies Respondent's request for release on this basis.

■ Respondent also cites Title 18 U.S.C. § 3188 for a similar proposition. No case authority is offered in this regard. While § 3188 requires the United States to deliver a person committed for extradition to a foreign government within two months, that provision has no application to the proceedings in this case, at this stage, as commitment does not occur prior to the certification of the Respondent's extraditability by the Court. *Barrett v. United States*, 590 F.2d 624 (6th Cir.1978). For this reason, Respondent's challenge in this regard is denied.

■ Finally, Respondent filed FINDINGS OF MEXICAN LAW EXPERT RODOLFO GASTELUM PEREZ RE: ABSENCE OF PROBABLE CAUSE; SYNOPSIS; AND CURRICULUM VITAE which asserted procedural, substantive and constitutional infirmities under Mexican law in the extradition request and in the arrest warrant. The long list of challenges to the probable cause finding in *Mexico* and the other alleged infirmities are not fully set forth herein as the Court finds the opinions of Attorney Gastelum are irrelevant to these proceedings.

■ Under Article 10(7) of the Treaty, the probable cause determination is to be made in accordance with the laws of requested party (here, the United States). Under

13. The documents themselves do not have to filed in court by the 60 day period, only received by the United States. *United States v. Wiebe*, 733 F.2d 549, 554 (8th Cir.1984); *Bozilov v. Seifert*, 983 F.2d 140 (9th Cir.1992).

14. See footnote 10.

15. The Treaty, in Article 11, and 18 U.S.C. § 3187 allow for the provisional arrest and detention of a fugitive in advance of the presentation of formal proofs. The request for a provisional arrest is based, in significant part, upon the existence of a warrant for the fugitive's arrest issued in the district of the authority making the request and charging the fugitive with a commission of crime for which his extradition is sought to be obtained. Article 11, itself, cites that urgency to arrest and detain an individual supports this initial procedure.

United States law, the standard of probable cause is whether there is any evidence warranting the finding that there was reasonable ground to believe the accused guilty. *Fernandez v. Phillips*, 268 U.S. 311, 45 S.Ct. 541, 69 L.Ed. 970 (1925); the probable cause is sustained if competent evidence to establish reasonable grounds is presented, not necessarily evidence competent to convict. *Collins v. Loisel*, 259 U.S. 309, 317, 42 S.Ct. 469, 66 L.Ed. 956 (1922). If the drafters of the Treaty had intended the judicial officer to consider the admissibility and weight of the evidence under the law of the requesting party (i.e. Mexico), they could have easily added that provision. *In Matter of Extradition of Lui Kin–Hong*, 939 F.Supp. 934 (D.Mass.1996).[16] Further, it is not the responsibility of this Court to assess the probability that the requesting party will be able to secure a conviction. *Id.* at 952.

■■■ Finally, the scope of admissible evidence in an extradition hearing is guided by the distinction between contradictory and explanatory evidence. *Republic of France v. Moghadam*, 617 F.Supp. 777 (N.D.Cal.1985). Attorney Gastelum's opinions are contradictory, at best, and excludable on that basis. Respondent has no right to rebut prosecutorial evidence (here, the basis and procedural compliance with the laws of Mexico as well as the determination of probable cause to issue the warrant in Mexico). *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir.1980). Those issues will ultimately be resolved by the trial court, along with the sufficiency of the evidence regarding guilt. *Garcia–Guillern v. United States*, 450 F.2d 1189, 1192 (5th Cir. 1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972).

### Nature of Hearing and Requisite Elements for Extradition

Under 18 U.S.C. § 3184, *et seq.*, in order to extradite the Respondent, the United States, on behalf of the Republic of Mexico, must establish that:

(1) The judicial officer is authorized to conduct extradition proceedings;

(2) The court has jurisdiction over the respondent;

(3) The applicable treaty is in full force and effect;

(4) The crimes for which surrender is sought are included within the terms of the treaty; and,

(5) There is probable cause that a crime or crimes were committed and that the Respondent participated in or committed them. *Bingham v. Bradley*, 241 U.S. 511, 36 S.Ct. 634, 60 L.Ed. 1136 (1916); *McNamara v. Henkel*, 226 U.S. 520, 33 S.Ct. 146, 57 L.Ed. 330 (1913); *Zanazanian v. U.S.*, 729 F.2d 624 (9th Cir.1984).

If the Court determines that all the requisite elements have been met, the findings are incorporated into a certificate of extraditability. The certificate is forwarded to the Department of State. The Secretary of State makes the ultimate decision on whether to surrender the Respondent. 18 U.S.C. § 3184, *et seq.*

### Discussion of Elements and Evidence

1. *The judicial officer is authorized to conduct the extradition proceedings.*

The authority of a magistrate judge to conduct the proceedings is provided by 18 U.S.C. § 3184, *Ward v. Rutherford*, 921 F.2d 286, 289 (D.C.Cir.1990) and Rule 74 of the Local Civil Rules of the United States District Court of the Southern District of California. This element was not challenged by the Respondent.

2. *The court has jurisdiction over the Respondent.*

The court has jurisdiction over the Respondents if they are before the court. *In Matter of Extradition of Pazienza*, 619 F.Supp. 611 (S.D.N.Y.1985). This issue was not challenged by the Respondent.

3. *The Treaty is in full force and effect.*

■■■ The law limits extradition to circumstances where the Treaty is in full force and effect. 18 U.S.C. § 3184, *Argento v. Horn*, 241 F.2d 258 (6th Cir.1957). A certified copy of the extradition Treaty between the United States of America and Mexico of May 4, 1978

---

16. Habeas corpus was subsequently granted, *Kin–Hong v. United States*, 957 F.Supp. 1280 (D.Mass.1997) but reversed on appeal. *United States v. Kin–Hong*, 110 F.3d 103 (1st Cir.1997).

(TIAS 9656) was submitted by the United States in support of its position that the Treaty is presently in full force and effect. The Department of States's opinion is entitled to deference. *Galanis v. Pallanck,* 568 F.2d 234 (2d Cir.1977); *Sayne v. Shipley,* 418 F.2d 679 (5th Cir.1969) *cert. denied,* 398 U.S. 903, 90 S.Ct. 1688, 26 L.Ed.2d 61 (1970).

Respondent asserts that the Treaty in this instance is invalid due to changed circumstances. Specifically, Respondent submits that the Treaty is invalid because the use of torture in Mexico in obtaining evidence, including the evidence in this matter, is contrary to the law of the United States. Respondent also asserts that not only have the governing administrations changed in Mexico and the United States since the 1978 signing of the Treaty, but the purpose and intent of the parties is materially different from what it was at the time the Treaty was signed. No precise authority is offered in regard to this premise.

■ In fact, the prevailing authorities are clear that:

> The decision to honor or reject a treaty partner's request for extradition can have important foreign policy implications. For this reason, the final decision to extradite (or not) has long been recognized to be the prerogative of the branch of government that is primarily responsible for the conduct of foreign affairs—the executive branch, acting through the Secretary of State. See 18 U.S.C. § 3186. *In The Matter of the Extradition of Lui Kin-Hong,* 939 F.Supp. at 958.

■ The decision to honor a request for extradition is "political", not "judicial". *Terlinden v. Ames,* 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534 (1902). The proper authority for the political decision here is, of course, the Secretary of State.

■ The principle argument regarding changed circumstances is the existence of the practice of torture by Mexican authorities.

In the absence of legal authority to support the court's ability to find the treaty invalid for changed circumstances or that the purpose and intent of the parties in this instance is materially different, Respondent's position in this regard is rejected. The power to make treaties is constitutionally invested in the executive branch of the United States government. Treaties, by design, live well beyond the administration involved in their enactment. There is no evidence to suggest that the United States no longer honors the treaty or that its purpose and intent are no longer served. In fact, it is the United States, on behalf of the Republic of Mexico, that is the moving party in this proceeding, pursuant to the subject Treaty. Ultimately, Article 9 of the Treaty invests the "executive authority" with the final discretion.[17]

4. *The crimes for which surrender is sought are included within the terms of the Treaty.*

■ According to the United States' submissions and consistent therewith at the hearings, Mexico seeks extradition of the Respondent for the Mexican charges identified above.

The Court concludes that each of the crimes for which extradition is requested by Mexico are among those specified in the Treaty but that only Criminal Association and First Degree Murder are analogous to United States law. Only the criminal association (conspiracy) and murder charges satisfy the dual criminality requirement for extradition. In re Petition of France for *Extradition of Sauvage,* 819 F.Supp. 896 (S.D.Cal.1993). For the reasons set forth in the Memorandum Decision Denying Bail (see footnote 1), the Court finds that the offense of carrying a firearm exclusive to the Army, Navy and Air Force lacks dual criminality and petitioner fails in its burden regarding extradition on that matter.[18]

**17.** Article 9(1) provides in pertinent part, "the executive authority of the requested party shall ... have the power to deliver them up if, in its discretion, it is deemed proper to do so".

**18.** In the original request, Mexico sought extradition on the firearm offense related to events and circumstances alleged to have occurred on April 13, 1994. In the supplemental request for extradition filed in January, 1997, the facts supporting the firearms offense were related to the first degree murder of Mr. Gallardo and Mr. Sanchez alleged to have occurred on or about April 9, 1996. The charge related to the 1994 event has been abandoned. See footnote 10.

Respondent has been accused by Mexico of murder in violation of Mexican law. Mexican law defines murder (or homicide) as taking the life of another (Article 302). Under United States law, (i.e., California Penal Code §§ 187–199) murder is unlawful and similarly defined. Homicide is an extraditable offense under Article 2(1) and Appendix Part 1 of the treaty. Finally, the Respondent is accused by Mexico of criminal association (conspiracy) in violation of Mexican law. This is defined as an individual who is a member of a group or gang of three or more persons whose purpose is to carry out criminal activity (Article 164). Criminal activity is defined as those who agree to or plan the crime, commit the crime themselves and/or commit the crime jointly with others (Article 13, Sections 1 through 3, inclusive). Under United States law, a conspiracy is an agreement among two or more persons to commit a crime. 18 U.S.C. § 371. Conspiracy to commit a crime is an extraditable offense under Article 2(4)(a) of the Treaty.

> 5. *There is probable cause that a crime or crimes were committed and that the Respondent participated in or committed the crimes.*

The murder and conspiracy offenses, above described, survive the Respondent's challenge. A review of the evidence submitted in support of those charges meets the requirements regarding identity and probable cause sufficient to fulfill the fifth extradition requirement. That conclusion is based on the following analysis.

The Treaty between the United States and Mexico calls for probable cause to be measured by the standards established in the requesting country. Article 3 of the Treaty says, in part:

> ARTICLE 3 *Evidence Required*
>
> Extradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party, either to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place . . . .

In this case, that means as defined in federal law. *Oen Yin–Choy v. Robinson,* 858 F.2d 1400, 1407 (9th Cir.1988). The magistrate judge need only determine whether there is competent evidence to justify holding the Respondent for trial, not whether the evidence is sufficient to justify conviction. *Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 66 L.Ed. 956 (1922). The magistrate's function is to determine whether there is "any" evidence establishing reasonable or probable cause. *United States ex rel Sakaguchi v. Kaulukukui,* 520 F.2d 726, 730–731 (9th Cir.1975).

An extradition hearing is not a criminal proceeding and the person whose return is sought is not entitled to the rights available in a criminal trial at common law.[19] *Neely v. Henkel,* 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901); *Simmons v. Braun,* 627 F.2d 635 (2d Cir.1980); *Charlton v. Kelly,* 229 U.S. 447, 461, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *Glucksman v. Henkel,* 221 U.S. 508, 512, 31 S.Ct. 704, 55 L.Ed. 830 (1911).

Evidence that conflicts with that submitted on behalf of the demanding party is not permitted, nor is impeachment of the credibility of the demanding country's witnesses. *Collins v. Loisel,* 259 U.S. 309, 315–317, 42 S.Ct. 469, 66 L.Ed. 956 (1922), *In re Locatelli,* 468 F.Supp. 568 (S.D.N.Y.1979). Extradition treaties do not contemplate the introduction of testimony of live witnesses by the Respondent to contradict the demanding country's proof. *Bingham v. Bradley,* 241 U.S. 511, 517, 36 S.Ct. 634, 60 L.Ed. 1136 (1916). Explanatory evidence is allowed only if the evidence would, clearly, negate a showing of probable cause. *In re Sindona,* 450 F.Supp. 672, 685 (S.D.N.Y.1978), *aff'd,* 619 F.2d 167 (2d Cir.1980), citing *Collins, supra,* 259 U.S. at 316. Thus, it has been held appropriate to permit evidence that tends to obliterate probable cause but not evidence which merely contradicts the same. *In the Matter of the Extradition of Contreras,* 800 F.Supp. 1462, 1464 (S.D.Tex.1992). In *Shapiro v. Ferrandina,* 355 F.Supp. 563, 572

---

**19.** Respondent's requests for cross examination of Petitioner's witnesses pursuant to Fed. R.Crim.P. 5.1 is denied. No applicable authority was presented on this point and prevailing authority as set forth herein supports this ruling.

(S.D.N.Y.), *affirmed as modified,* 478 F.2d 894 (2d Cir.1973) the court stated in part:

> The improbability or the vagueness of the testimony may destroy the probability of guilt, but the tendering of witnesses who testify to an opposite version of the facts does not. The latter must await a trial on the merits.

 The magistrate judge conducting the extradition proceeding has wide latitude in admitting evidence. *Extradition of Kraiselburd,* 786 F.2d 1395, 1399 (9th Cir.1986). Hearsay evidence is admissible on behalf of the Respondent to establish the "obliteration" of probable cause. *United States v. Taitz,* 130 F.R.D. 442 (S.D.Cal.1990).

### (a) *The Homicide*

There is no question, and no conflict in the evidence, that Gallardo and Sanchez were shot and killed by two individuals on April 9, 1996, at approximately 9:30 p.m., at the entrance of the restaurant at the Holiday Inn in Toluca, Mexico. The two perpetrators escaped in a white Volkswagen. The record is overwhelming with eyewitness testimony,[20] autopsies and physical evidence from the scene to establish these facts.[21] The real issue in this proceeding is whether or not there is probable cause to establish that Respondent was one of the perpetrators.

### (i) *MEXICO'S CASE IN CHIEF*

 Respondent was identified in statements of alleged co-conspirators Fausto Soto Miller, aka "Joel Fierro," "El Chef" or "El Cocinero" (hereinafter "Soto");[22] Cruz; Gilberto Vasquez Culebro, aka "El Gorras" or "El Cachuchas" (hereinafter "Vasquez"); as well as witnesses, Alejandro Enrique Hodoyan Palacios, (hereinafter "Alejandro"); and, Gustavo Miranda Santacruz, (hereinafter "Miranda") with involvement in a host of criminal activities on behalf of the Arellano Felix organization and in particular with the shooting of Gallardo and Sanchez. Specifically, their testimony is summarized as follows:

A. *Gerardo Cruz Pacheco, aka "Capitan,"*—On October 12, 1996 at 1:00 p.m.,[23] Gerardo Cruz Pacheco, aka "Capitan," (hereinafter "Cruz"), made a signed statement before Alma Leticia Lares Tenorio, an agent of the Mexican Federal Public Prosecutor. Defense counsel was provided for Mr. Cruz. Cruz testified based upon his personal acquaintance with the individuals named in the statement, and his participation in various events and circumstances, as well as conversations, with the individuals involved. Cruz declared that in April 1996, he received a message from Martinez instructing him to meet at the Glorieta del Angel at 6:00 p.m. At that location, Cruz met with Valdez, Martinez and Contreras. These three were carrying short-range firearms in a white Volkswagen. Valdez and Martinez drove off in the white Volkswagen and Cruz and Contreras followed them in a navy blue Cutlass.[24]

During the drive, Contreras told Cruz that, "his friends in the white Volkswagen wanted to say hello to a fellow citizen who was in Toluca to train for boxing." When they reached Toluca, Valdez and Martinez stopped to make several telephone calls, at approximately 9:00 p.m.

When the two cars arrived at the Holiday Inn in Toluca, Valdez got out of the white Volkswagen and told Contreras, "Be, cautious, wait for me here and when you see us going out from the parking lot in the white Volkswagen, you should form a 'wall' so that we cannot be followed."

---

20. i.e. Sebastian Gutierrez Jaime, Olga Patricia Gonzalez Garcia, Juan Manuel de la Cruz and Pablo Garcia Martinez.

21. This evidence is certified by the principle diplomatic or counsular officer of the United States in Mexico and is received into evidence pursuant Article 10(6) of the Treaty and 18 U.S.C. § 3190. Since the evidence was undisputed it is not detailed extensively herein.

22. The individuals related to this case are often referred to in the evidence by nicknames.

23. Cruz made several statements relative to this matter. They are:

 (1) The Statement of October 12, 1996 at 1:00 a.m. in Mexico City; and,
 (2) A Preparatory Statement of October 13, 1996, at 7:50 p.m. made before the *First District Judge* of Federal Criminal Proceedings in the State of Mexico, at the Federal Center for Social Rehabilitation Number 1, in Judicial Proceedings Courtroom Number One.

24. A Volkswagen was seen leaving the scene by eyewitness Juan Manual de la Cruz.

At approximately 9:30 p.m., Cruz, who was about twenty meters away from the entrance of the Holiday Inn heard several firearms shots. A few seconds passed and then he saw the white Volkswagen speed out of the parking lot. Seeing no one in pursuit, Cruz followed the white Volkswagen in the navy blue Cutlass.

The two cars stopped in the village of San Mateo Atenco. Valdez then smiled and announced, "The Baby paid me off. Nobody threatens my brother because the moron who does it, dies."

Several days went by before Cruz met with Valdez, Martinez, Contreras and Cabrera. Martinez told Cruz that he would receive some money if Cruz would hold the 38 Super and the 9mm guns that they had used to kill Gallardo and Sanchez.

Cruz identifies photographs numbered 53, 54 and 55, respectively as depictions of Respondent Valdez.

■ B. *Gustavo Miranda Santacruz* — On November 19, 1996, Gustavo Miranda Santacruz (hereinafter "Miranda") made a declaration before Assistant United States Attorney, Gonzalo P. Curiel, acting as Mexi-

co's agent pursuant to a request under the mutual Legal Assistance Treaty that exists between Mexico and the United States.[25] Miranda testified based upon his acquaintance with the individuals described in his statement, his personal presence at various of the events and circumstances described and conversations with the involved individuals. Miranda was granted "use immunity" for giving the statement. Miranda declared that Valdez and Martinez committed the murder of Gallardo. Miranda stated that the murder took place the first part of April 1996, at the Holiday Inn in Toluca. He stated that Valdez and Martinez used a white colored vehicle and that they used another car for protection. Miranda added that the motivation for assassination was that Gallardo had threatened Gabriel Valdez Mainero (Emilio Valdez Mainero's brother) with a firearm.[26]

Miranda also identifies Respondent as the person depicted in various photographs reference as numbers 53, 54, 55, 73 and 74.

C. *Fausto Soto Miller, aka "Chef"* —In his September 27, 1996[27] declaration before an agent of the Mexican Federal Public Prosecutor, Fausto Soto Miller, "Chef," (hereinaf-

---

**25.** While there is no corroborating evidence outside of this declaration itself, that Mr. Curiel was in fact an agent of Mexico under the mutual legal assistance treaty, nor was a copy of that treaty provided, this evidence is received over respondents objection and pursuant to Article 10(6) of the Treaty and 18 U.S.C. § 3190 having been properly and legally certified and authenticated by Bruce A. Beardsley, principal counsular officer of the U.S. in Mexico.

**26.** In Respondent's REPLY TO GOVERNMENT'S RESPONSE RE: EXTRADITION AND REQUEST FOR DISCOVERY (Docket No. 30), he requests discovery regarding the statement by Miranda. Specifically, the tape of the interview with Miranda, all notes and interview sheets, and documentation concerning Assistant United States Attorney Curiel's agency on behalf of Mexico. Discovery is not available in extradition proceedings. *Peryea v. United States,* 782 F.Supp. 937 (D.Vt.1991); *Jhirad v. Ferrandina,* 536 F.2d 478 (2d Cir.1976). There is no authority that exists that requires a magistrate judge to authorize compelled disclosures of explanatory information. The extradition proceeding is not a criminal trial nor is Respondent entitled to the rights available in a criminal trial at common law. *Neely v. Henkel,* 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901). Respondent's request for discovery is denied. The admissibility of Miranda's statement, as taken by Assistant United

States Attorney Curiel, was previously discussed. *See* footnote 25. The request for discovery regarding Miranda was also submitted in RESPONDENTS SUPPLEMENTAL SUBMISSION RE: EXTRADITION AND REQUEST FOR DISCOVERY filed June 26, 1997 in Case 96–1828 (Docket No. 33) which is similarly denied for the reasons stated.

**27.** Soto actually made a series of statements relative to this matter. They are:

(1) Ministerial Statement of September 27, 1996, at 1140 a.m. to Maria Isabel Gonzalez Chavez, an agent of the *federal prosecutor, in Guadalajara, Mexico;*

(2) Additional Ministerial Statement of September 27, 1996, at 6:30 p.m. to Maria Isabel Gonzalez Chavez, an agent of the *federal prosecutor, in Guadalajara, Mexico;*

(3) Additional Statement of September 30, 1996, at 9:00 p.m. to Maria Isabel Gonzalez Chavez, an agent of the *federal prosecutor in Mexico City, Mexico;* and,

(4) Preparatory Statement of October 2, 1996, at 6:00 p.m. before the District Judge of the Federal Criminal Proceedings in the State of Mexico, at the Federal Center for Social Rehabilitation Number 1, in Judicial Proceedings Courtroom Number One.

ter "Soto") stated that he was aware of the personal problems between Valdez and Gallardo, arising out of a threat with a firearm against Gabriel Valdez made by Gallardo. Soto's testimony is based upon his acquaintance with the individuals referenced in the statement, and his role as a cook residing at various times with these individuals. Mr. Soto was privy to certain events and conversations forming the basis of his knowledge. Mr. Soto also provides a physical description of Respondent. Defense counsel was provided for Mr. Soto for purposes of his testimony.

D. *Gilberto Vasquez Culebro, aka "Cachuchas"*—On September 30, 1996, Gilberto Vasquez Culebro (hereinafter "Vasquez") gave a statement to Jose Luis Juarez Garcia, an agent of the Mexican federal public prosecutor in Mexico City, Mexico. Defense counsel was provided for Mr. Cruz Vasquez identifies himself as a member of the AFO and states that in March, 1996, he had several visitors to his home, including Respondent Valdez, Martinez, and co-extraditee Alfredo Hodoyan Palacios. These individuals left his home the following day for Mexico City in a light grey Spirit automobile. These individuals returned to Mr. Vasquez' home in April of 1996 and stated that they were running from the authorities because they had committed a homicide in Mexico City. Mr. Vasquez states that the individuals acted suspiciously and carried long and short range firearms. They also indicated that their boss, Ramon Arellano Felix, would be pleased with the last job they had carried out. Mr. Vasquez testified based upon his acquaintance and interaction with Respondent and his involvement in the events he describes.

E. *Alejandro Enrique Hodoyan Palacios*—On November 30, 1996, Alejandro Enrique Hodoyan Palacios (hereinafter "Alejandro") gave a deposition at the office of the Attorney General of the United States of Mexico. Alejandro, who is the brother of extraditee Alfredo Miguel hodoyan Palacios aka "Lobo",[28] stated that his brother told him that Valdez and Martinez had participated in the murder of Gallardo at the Holiday Inn Hotel in Toluca. He states that the reason that Gallardo was murdered was because he had allowed "Chapo Guzman" into the territory of Tijuana to deal drugs and push out Benjamin Arellano Felix. Chapo Guzman gave marijuana to Gallardo so that he could move it into the United States, but afterwards, Chapo Guzman sent the Federal Police after him. When arrested, Gallardo said that the marijuana belonged to Benjamin Arellano Felix, which caused the issuance of an arrest warrant for Benjamin Arellano Felix.[29] Clearly, Alejandro's testimony is based upon his personal knowledge derived from his acquaintance with Respondent and the other individuals named and his discussion and observations in their presence.

The certified documents submitted by Mexico, including the statements of Cruz, Miranda, Soto, Vasquez and Alejandro are admitted into evidence in accordance with Article 10(6) of the subject Treaty and 18 U.S.C. § 3190.

**(ii) *RESPONDENT'S EVIDENCE***

 In response to this evidence, Valdez offers statements of Gabriel Valdez, Marci Ramirez Marin de Gonzalez and Eva Marin viuda de Pena.[30] These statements challenge the "motive" for the Gallardo murder as stated by Cruz and Miranda. This evidence is clearly contradictory and inadmissible under *Collins v. Loisel*, 259 U.S. 309, 315–317, 42 S.Ct. 469, 66 L.Ed. 956 (1922). As noted previously, Respondent also offers the expert opinion of Rodolfo Gastelum Perez which has been excluded under the analysis previously set forth.[31]

Finally, Valdez offers that Cruz, Soto, Alejandro and Vasquez[32] were subjected to tor-

---

**28.** See, *IN THE MATTER OF THE EXTRADITION OF ALFREDO HODOYAN PALACIOS,* U.S.D.C. No. 96mg 1828(AJB).

**29.** Respondents request for discovery of all evidence of discussions with Alejandro Hodoyan is denied on the basis of the authority set forth in footnote 26, except to the extent that this information was produced in response to the Court's order of September 11, 1997 (see footnote 6).

**30.** Respondent's Exhibits H, I and J, respectively, docket No. 25.

**31.** See discussion at page 1213, line ——, *et seq.*

**32.** Respondent also argues that the statements of Francisco Cabrera Castro and Edgar Alejandro Gonzalez Gonzalez offered by Mexico were also "extracted" by torture. These statements do not add a great deal to Mexico's case regarding this

ture, and were under duress at the time of the "alleged" statements.[33] As such, it is argued that the statements were not credible, nor should they support extradition in this case. In this regard, statements characterized as "recantations" were offered by Cruz, Soto and Hodoyan. Respondent had indicated that a recantation by Vasquez would be filed, but no such document has been offered in evidence in this case. It is argued that Vasquez suffered similar mistreatment at the hands of the Mexican authorities and had recanted the statement attributed to him in Mexico's case in chief. Respondent also argues that Alejandro was abducted in the Spring of 1997 by representatives of Mexico which corroborates Mexico's alleged use of inappropriate force and means to secure evidence in this case.

 Where a prior statement is shown to be coerced and the indicia of reliability is on the recantation, then the subsequent statement negating the existence of probable cause is germane in an extradition proceeding. *In the Matter of Extradition of Contreras,* 800 F.Supp. 1462, 1469 (S.D.Tex.1992). Recanting statements are relevant in these proceedings as they affect probable cause. *Gill v. Imundi,* 747 F.Supp. 1028, 1049 (S.D.N.Y.1990); *Republic of France v. Moghadam,* 617 F.Supp. 777(N.D.Cal.1985). The essential question is whether the indicia of reliability is on the recantation or the initial statement.

### A. *Alejandro's Declaration*

The respondent offers a handwritten declaration of Alejandro, dated March 3, 1997, to document his being detained, interrogated and tortured. Actually, this declaration is not signed by Alejandro, nor was it written by Alejandro. The document was written by Alejandro Hodoyan Ramirez, father of both Alejandro and Alfredo Hodoyan Palacios who is also an extraditee sought by Mexico. The

statement is a summary of what Alejandro described to his family and includes information related to meeting General Gutierrez Rebollo as well as contact with DEA and FBI agents who pressured him to sign a confession in exchange for removal from Mexico and protection thereafter. In addition to being signed by extraditee's father, other family members similarly signed attesting to the authenticity and veracity of the document. On June 26, 1997, respondent filed a SUPPLEMENTAL SUBMISSION RE: EXTRADITION AND REQUEST FOR DISCOVERY[34], with an attached declaration of Augustin Hodoyan (Alejandro's brother) with Alejandro's personal notes which were used to create the March 3, 1997 declaration. At the time of the June 30, 1997 hearing, a typed translation of Alejandro's personal notes was offered. The notes are identified by Augustin Hodoyan, Alejandro's brother. Augustin also indicates that Alejandro told him that the Mexican officers intended to torture and kill Alfredo Hodoyan Palacios should he be extradited to Mexico. The personal notes and translation were offered to corroborate the declaration and the explanatory evidence with regard to Alejandro's testimony.

 Mexico takes issue with the March 3, 1997 declaration, noting that it was not signed by the declarant, nor is part of an official proceeding or under penalty of perjury. It is further argued that there is a strong motivation on behalf of the Hodoyan family to help Respondent and this would give rise to questions with regard to the trustworthiness of the document. Mexico also argued that the document was not certified as required by the treaty and would be presumptively inadmissable. The Court is not limited in its receipt of this evidence by virtue of the lack of certification. The Court may act upon unsworn statements of absent

Respondent. In fact, they are of relatively little evidentiary value herein and as such, an extended analysis is unnecessary.

**33.** On June 19, 1997, Respondent filed a REPLY TO GOVERNMENT'S RESPONSE RE: EXTRADITION AND REQUEST FOR DISCOVERY requesting, among other things, that the Court "order the government to turn over any other relevant information which might help the de-

tainee explain the 'evidence' lodged against him" (Docket No. 30). There is no authority that exists that requires a magistrate judge to authorize compelled disclosures of explanatory information. *Neely v. Henkel,* 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901). Respondent's discovery request in this regard is denied.

**34.** Docket No. 32.

witnesses, although they could not have been received by the judge under the law of the state in a preliminary examination. *Elias v. Ramirez*, 215 U.S. 398, 30 S.Ct. 131, 54 L.Ed. 253 (1910); *Rice v. Ames*, 180 U.S. 371, 21 S.Ct. 406, 45 L.Ed. 577 (1901). This is part of the framework created by case law in these proceedings.

 Certainly, the decision to act upon this type of evidence rests upon some indicia of authenticity and reliability. The United States has filed videotapes of Alejandro's November 30, 1996 deposition. It is asserted that the videotapes demonstrate Alejandro's demeanor and rebut the assertion that Alejandro testified as a result of any torture or duress. The United States has also offered statements from interviews between Alejandro and federal agents in February of 1997 which are asserted to corroborate Alejandro's knowledge of the AFO and his willingness to cooperate. Finally, the United States submits evidence in the form of statements attributed to Respondent related to the disappearance and murder of Alejandro by the AFO and the organizations efforts to effect a recantation of Alejandro's November 30, 1996 deposition. These latter efforts resulted in the formulation of the March 3, 1997 "declaration."

The videotapes clearly demonstrate Alejandro's demeanor. The Court finds that the videotapes do show a cooperating witness. Alejandro provides an unrestrained narrative discussion of various events and circumstances, prompted by periodic questions and all simultaneously recorded in an office on CPU's. The environment where the deposition was taken is not suggestive of any coercive circumstances. While obviously nervous as he recounts the AFO's activities, there are no signs of physical abuse or manifestations consistent with psychological pressure or duress. The interviews of Alejandro in the United States confirm the uncoerced willingness of Alejandro to provide testimony concerning the criminal activities of the AFO and Respondent's role therein.

The statements attributed to Respondent Valdez from the wiretape surveillance,[35] result in a finding that Alejandro's March 3, 1997 declaration and personal notes were contrived and are unreliable. This latter evidence also results in a finding that any hostile action taken toward Alejandro and resulting in his disappearance and murder was more likely than not prompted at the direction of the AFO and not Mexico. The indicia of reliability is clearly on the November 30, 1996 deposition offered in Mexico's case in chief.

### B. *Recantations by Cruz and Soto*

 Respondent also offers, as evidence to defeat probable cause, recantations by Cruz and Soto relative to the earlier statements[36]. The "recantations" from Cruz and Soto are in the form of testimony before a judge of the First District of Federal Criminal Proceedings in the State of Mexico.[37] These statements were taken in open Court, at the time that Cruz and Soto were arraigned on charges filed against them by the Republic of Mexico and based upon the statements given to the public prosecutor.[38] Specifically, Cruz was charged with homicide and Soto was charged with possession of various

**35.** This evidence was received under seal in 96mg1828 and as a result, the specifics are not detailed or recited herein.

**36.** A recantation of Francisco Cabrera Castro is also filed and argued to support Respondent's position. For the reasons set forth in footnote 32 an extended analysis of the recantation is not set forth, nor is the recantation viewed any differently than those of Cruz and Soto.

**37.** Respondent criticizes Mexico for not filing this set of documents. In fact, Respondent urges the Court to dismiss this proceeding stating that the Mexican Attorney General's office held back these statements because of their negative impact on the probable cause analysis. MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION RE: DETAINEE'S RE-

SPONSE TO EXTRADITION REQUEST AND REQUEST FOR RELEASE, p. 55, lines 17, *et seq.*, Docket No. 23. The Federal Rules of Criminal Procedure and the Federal Rules of Evidence are not applicable in extradition proceedings. *Simmons v. Braun*, 627 F.2d 635 (2d Cir.1980). As set forth in Footnote 26, the rights normally available in a criminal trial are not available in this proceeding. Lastly, there is no authority that requires a magistrate judge to compel disclosure of explanatory information. Based on case authorities Respondent's Motion in this regard is denied.

**38.** These are the same statements offered in this matter to support the request for extradition.

weapons, and a narcotics related offense (possession of marijuana). Each "recantation" is essentially a denial of the former statement(s) in their entirety and an allegation of torture and abuse at the hands of the Mexican authorities.

The statement by Cruz to the federal prosecutor did indicate that Cruz had suffered recent physical injury. In that statement, Cruz was noted to have suffered multiple burns which were attributed to an incident several days before when he was inspecting the exhaust pipe of a vehicle. An injury to the anterior upper third of his right leg is claimed to have resulted from a fight with an unknown person. When he appeared in court, the judge also noted, on the record, residual signs of physical injury. The signs of injury included 16 irregularly circular scars, 17 circular scars and 3 small scars on the chest as well as a hematoma to the upper base of the nose and a circular bruise on the right chin.

In the statement to the judge, with the assistance of counsel, Cruz was asked by the Court if he desired to make a statement concerning the facts that are attributed to him in the subject statement. Cruz describes his mistreatment and torture at the hands of the Mexican authorities. In contesting the accuracy of the statement of the federal prosecutor, he "rejects" the alias described to him, the reported rank in the infantry, and claims that he does not belong to the Presidential General staff but to the Presidential Guards Corps. Finally, he contests the date of arrest. Beyond that, he reports preparing a letter of resignation from the Department of National Defense under torture. No further "recantation" exists, although he does "appeal that accusation" (the charges brought against him are on the basis of the statements).

As to Soto, his three statements to the Mexican authorities, two on September 27, 1996 and one on September 30, 1996, respectively, do not reference any injury. After the statements of September 27, 1996, a medical doctor examined Soto and found no traces of any recent physical wounds. It was not until October 2, 1996 that Soto described the alleged torture to the judge in Mexico.

Soto is also asked of his desire to make a statement concerning the facts attributed to him in his statement. Soto acknowledges having signed the statement as well as affixing his fingerprints. He goes on to state that he signed it because he was subjected to psychological pressure and that it was a "lie". Soto also explains the details of the alleged abuse visited upon him. Soto contends that he was arrested on September 12, 1996 and held in custody for some weeks. This is in contrast to the September 27, 1996 arrest date noted in the statement to the federal prosecutor. Again, no more precise recantation of the specific events exists.

Mexico contests the reliability of these recantations asserting that they are self serving, lacking in reliability and inadmissable as contradictory evidence. Mexico also cites the medical examination of Soto following the September 27, 1996 statements concluding that there were no traces of any recent physical wounds. Respondent asserts that Soto lost an eye as a result of the torture used by Mexico to extract his statement [39]. There is no evidence, however, in this regard. There was no mention of the lost eye in the medical exam performed by the Republic of Mexico or during the court proceedings where the alleged recantation took place. In fact, in the statement to the district judge on October 2, 1996, Mr. Soto indicates that he has no physical defects.

Support for the reliability of Soto's "recantation" (and by inference the other recantations) is offered by Respondent in an unsigned and uncertified declaration of First Seargent Vicente Ruiz Martinez, submitted on June 30, 1997 at the extradition hearing. This document is submitted to be from the files in the prosecution of General Gutierrez Rebollo, by the Republic of Mexico, in Mexico. There is no corroborating evidence regarding the source, however. The document is not authenticated. Support for its origin is suggested from a New York Times article [40].

**39.** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION RE: DETAINEE'S RESPONSE TO EXTRADITION REQUEST AND REQUEST FOR RELEASE, Page 6, lines 5–7 (Docket No. 24).

**40.** *U.S.–MEXICO DRUG WAR: Two Systems Collide*, New York Times, July 22, 1997.

Seargent Ruiz' statement appears to confirm Soto's statement that he was arrested prior to the September 27, 1996 date set forth in the statements made to the Mexican authorities. In the Ruiz statement, it appears that Soto was arrested at least no later than September 15, 1996. The Ruiz statement also describes the "detention" of Alejandro and Francisco Cabrera Castro, aka "Piedras".[41] All of these individuals are described as "prisoners" in the statement. No mention of torture or physical abuse is made.

Mexico more correctly characterizes the Ruiz statement as a summary of statements by Seargent Ruiz. Mexico also takes the position that the statement is inaccurate and not properly certified or executed. Mexico does acknowledge that there is an investigation ongoing concerning the actions of General Rebollo and his associates, and that the investigations include the "possible" unlawful detention of suspects. The Court's direction to the United States to request from Mexico a copy of the signed statement by Ruiz or other information confirming its authenticity and the actual arrest dates of the individuals involved has been met with a response that this information is not available.[42] The response from Mexico indicates that closed proceedings related to General Rebollo are ongoing in Mexico and that Ruiz is a witness therein.

The Ruiz statement presents conflict with regard to dates of the arrest of some of Mexico's witnesses and is asserted to corroborate the use of torture in this case as well as create conflicts in Mexico's evidence in challenging the reliability of the evidence Mexico relies upon in this proceeding. While Ruiz provides no direct account of any torture, this information supports a finding that Alejandro was "in custody"[43] along with others and supports an argument that extended detention was involved in the handling of the witnesses by Mexico.

If reliable, the recantations and the Ruiz statement would be evidence which would undermine the voluntariness of the statements offered by Mexico in their case in chief, and as a result, the evidence in support of probable cause for extradition. In the final analysis, this Court is required to look at the indicia of reliability with regard to the persuasiveness of this evidence. Recanting statements are relevant as they affect probable cause, but a showing that the prior statement is coerced and that indicia of reliability is on a subsequent recantation is the appropriate point of analysis on this issue. *In the Matter of Extradition of Contreras*, 800 F.Supp. 1462, 1469 (S.D.Tex.1992).

The purported recantation of Alejandro has been discarded with the indicia of reliability supporting the initial deposition. It is also notable, that the sum total of the evidence showed Alejandro's Declaration regarding torture and abuse to be contrived in its derivation. A concern over the authenticity of the evidence offered by way of the Ruiz declaration is also present. There is no credible evidence supporting the authenticity of this summary of testimony in the closed investigation in Mexico. There is nothing to confirm, corroborate or verify that the facts in the statement are in fact the testimony of Sergeant Ruiz, and based upon personal knowledge. While the Court has wide latitude in admitting evidence, and hearsay evidence is admissible, the Ruiz statement is without any legally reliable corroborating or authenticating evidence in this case. The Court is sensitive to the practical and legal limitations on Respondent's ability to challenge the evidence in the extradition proceeding. A full review of the evidence, however, is the provence of the trial court in the requesting nation. The limitations of the judicial review at this stage of the proceedings, however, should not be an excuse to admit evidence presented without apparent foundation or any independent indicia of trustworthiness.

---

**41.** The statement of Francisco Cabrera Castro, aka "Piedras" is offered in the Extradition of Alejandro Hodoyan Palacios, 96mg1828 AJB.

**42.** See RESPONSE TO REQUEST FOR ADDITIONAL INFORMATION IN SUPPORT OF EXTRADITION (Docket No. 44).

**43.** The balance of the evidence, as noted, does not lead to the conclusion that Alejandro was under duress, nor, that the November 30, 1996 deposition is unreliable.

In the final analysis, the Ruiz declaration is inadmissible given the lack of authenticity, certification or reliability and does little to support the recantations of Soto and Cruz. The indicia of reliability is in favor of the formal statements given to the Mexican authorities by Soto and Cruz and not their in court "recantations." The recantations are little more than self-serving declarations at the time of "arraignment" on the charges based upon the statements given to the federal prosecutor. They are under a compelled setting initiated by Mexican judicial authorities (as opposed to a self directed recantation by the declarants) and are no greater than a plea of not guilty when analyzed to similar proceedings under United States law. On the other hand, the formal statements of Soto and Cruz have significant detail concerning the personal background of the witnesses and the specifics of the offenses and related matters. These statements are also corroborated in significant part by Alejandro's declaration.

### C. *The Allegations of Torture*

A great number of questions exist, and many questions remain unanswered in this case. These questions cannot be answered within the narrow confines of an extradition proceeding and would be most properly addressed by the Secretary of State and/or the Court in Mexico on a trial on the merits. The scope of this proceeding is narrow and is limited to the existence of probable cause and the evidence, received by virtue of the Treaty provisions and applicable law. The credible evidence, satisfies Mexico's burden in this respect[44].

The suggestion of torture is certainly present in the record.[45] The thought of testimony coerced by torture is certainly abhorrent and inconsistent with tenets of our society. As a society we cannot suspend that concept by virtue of the interest of a foreign nation in the extradition of an United States citizen, the heinous nature of the offense notwithstanding. However, before we can indict evidence as tainted by the coercive effect of torture, satisfactory evidence must be pre-

sented. Argument, inference and innuendo is all that has really been presented here. The allegations of torture supported by some of the self serving statements of the witnesses and some factual conflicts (i.e. the arrest dates of Soto and Cruz), is unpersuasive as offered to totally obliterate probable cause under a *Contreras* analysis. The purported March 3, 1997 declaration of Alejandro is false and its manner of production and presentation erode any potential reliability. Ultimately, the Court concludes that there is no reliable evidence of torture or duress of the witnesses. The videotaped deposition of Alejandro is the only credible evidence to demonstrate the circumstances under which Mexico's evidence was collected. As earlier stated, the circumstances of Alejandro's testimony are not suggestive of torture, coercion or duress.

### D. *Other Challenges to Mexico's Evidence*

Challenges to the testimony of Cruz, Soto, Vasquez, Miranda and Alejandro based upon the argument that they are conclusory, unreliable hearsay, and unreliable as presented by alleged codefendants or co-conspirators are rejected.

 There is no prohibition against hearsay in the extradition context because the Federal Rules of Evidence, which proscribe hearsay, do not apply to extradition. Fed.R.Evid. 1103. In *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir.1986), the Ninth Circuit reaffirmed that hearsay evidence that would be inadmissible for other purposes is admissible in extradition hearings. The Ninth Circuit recognizes that barring hearsay from extradition hearings would thwart one of the objectives of bilateral extradition treaties by requiring the requesting nation to send its citizens to the extraditing country to confront the accused. *Zanazanian v. United States*, 729 F.2d 624, 626–27 (9th Cir.1984). In *Zanazanian*, the Ninth Circuit held that police reports which summarize the statements of witnesses are competent evidence,

---

44. There are some inconsistencies in the testimony when various statements are compared, but these are not significant differences affecting this analysis.

45. The physical injuries to Cruz are certainly suspicious in this regard.

even though the same documents would be inadmissible hearsay in other contexts.

In *Emami v. United States*, 834 F.2d 1444 (9th Cir.1987), Emami contended that Germany had presented no competent evidence upon which the district court could make a finding of extraditability because Germany relied on facts which prosecutor Keller related in his affidavit which consisted solely of inadmissible hearsay statements made by Emami's former patients and employees. The Ninth Circuit held that "[t]his contention lacks merit because under general extradition of the United States and under the provisions of Treaty, the hearsay statements Keller summarized in his affidavit are competent evidence." *Id.* at 1450–1451.

In the instant case, Mexico has submitted, *inter alia*, sworn declarations of percipient witnesses and accomplices to the crimes alleged against Valdez. These declarations bear even greater indicia of competency than the police reports accepted as competent evidence in *Zanazanian*. Furthermore, the sworn witness statements in the instant case are the type of evidence contemplated by the Treaty to avoid the need for the requesting country to send its witnesses to the requested country to testify at the extradition hearing.

Alejandro's statements are based upon his personal knowledge due to his admitted involvement in the AFO and their activities. Through observation and discussion, he became privy to the knowledge set forth. Miranda's statement was given to an officer of this Court. There is no indication of any coercion or duress, and in fact, Miranda is given "use immunity" with regard to the statement. Miranda's testimony is not only generally consistent with the statements of others, but is based upon his acquaintance and involvement with the individuals described therein.

The Ninth Circuit has held that self incriminating statements of accomplices are sufficient to establish probable cause in an extradition hearing. *Curreri v. Vice*, 77 F.2d 130, 132 (9th Cir.1935); *Eain v. Wilkes*, 641 F.2d 504, 510 (7th Cir.1981), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208.

■ *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), is also unpersuasive in this regard. In *Bruton*, the Supreme Court held that the admission of a co-defendant confession at a joint trial violates the defendants right to confrontation if the confession also incriminates the defendant. As indicated previously, the extradition hearing is not a trial, nor a criminal proceeding providing respondent with rights available in a criminal trial at common law. *Neely v. Henkel*, *supra*. The Court is not required to decide guilt or innocence, but only determines whether there is competent legal evidence to justify holding the accused for trial in the charging country. In re Petition of France for *Extradition of Sauvage*, 819 F.Supp. 896 (S.D.Cal.1993). The right of confrontation,[46] specifically, has been held inapplicable, as have the Federal Rules of Criminal Procedure, and the Federal Rules of Evidence. *Simmons v. Braun*, 627 F.2d 635 (2d Cir.1980). As a result, the accomplice argument does not negate reliability in this instance, nor does it defeat admissibility.

### (iii) *PROBABLE CAUSE FOR THE CRIME OF HOMICIDE EXISTS*

The entire record supports the finding that probable cause exists with regard to homicide charges. This finding could be based upon the testimony of Miranda and Alejandro, alone.

Alejandro's statement, at page 13, implicates Respondent[47] in the murder. The testimony of Miranda, taken by Assistant United States Attorney Curiel, corroborates the substance of the evidence collected at the

---

**46.** Respondent's repeated request to confront and cross-examine Mexico's witnesses under Fed.R.Crim.P. 5.1 is without authority and is unavailable in any event under prevailing authority. The Federal Rules of Evidence and of Criminal Procedure do not apply to an extradition hearing. *In the Matter of the Extradition of Contreras*, 800 F.Supp. 1462, 1464 (S.D.Tex.

1992); Fed.R.Evid. 1101(d)(3); and Fed. R.Crim.P. 54(b)(5).

**47.** Alejandro's testimony also implicates his brother concerning the involvement with the AFO, which relates to the pending extradition of Alfredo Hodoyan–Palacios, 96mg1828(AJB).

scene and statements by non-involved witnesses. The Miranda statement provides competent evidence to support a finding of probable cause that Valdez was involved in the Gallardo and Sanchez murders of April 9, 1996.

### (b) *Criminal Association*

 In support of its extradition request on the charge of criminal conspiracy, Mexico has provided, among other things, the following sworn, certified and authenticated witness statements which detail Valdez' membership and participation in the Arellano Felix drug trafficking organization:

(1) *Gerardo Cruz Pacheco aka "Capitan".* *("Cruz")* —In his October 12, 1996 statement, Cruz declared before an agent of the Mexican Federal Public Prosecutor that Valdez, Martinez and, Fabian Partiday, aka "Domingo," described to him crimes that they had committed, the firearms they used to commit the crimes, and the numerous cities in Mexico, in which they had committed crimes in furtherance of the goals of the AFO. Cruz declared that the group told him of multiple murders that they, including Valdez, had committed because the "boss was angry", referring to Ramon Arellano Felix. Cruz admitted his own involvement in the criminal activities of Valdez and the AFO and admitted that he was paid to assist them in killing the enemies of Ramon Arellano–Felix.

(2) *Gustavo Miranda Santacruz.* *("Miranda")* —In his November 19, 1996 declaration, Miranda states that he knows the Arellano Felix brothers. He declared that, in May, 1992, Ramon Arellano–Felix and Valdez killed rival drug traffickers, the Olmos brothers, and that Valdez told him and other members of the AFO that Valdez would pay $150,000 to them if they took the blame for the Olmos murders. Miranda also stated that in 1992, Valdez was in charge of cocaine trafficking, and that later, Valdez trafficked in 200 to 400 kilogram shipments of marijuana for the AFO. Miranda also declared that Valdez had told him he and Fabian Reyes Partida, aka "Domingo", (hereinafter Reyes) had assassinated Jesus Romero Magana because he was investigating Valdez' criminal activity. Miranda details numerous other criminal activities in which Valdez and others in the AFO were involved, including the as-

sassination of Larios Guzman, the July 1994 assassination of multiple military officers, the kidnaping and murder of a person with the last name Margain, and the kidnaping of a man with the last name Baloyan.

(3) *Fausto Soto Miller.* *"Chef" ("Soto")* — In his September 27, 1996 declaration before an agent of the Mexican Federal Public Prosecutor, Soto recalled an incident in which Valdez, Ramon Arellano Felix and other members of his organization met at a house rented by Valdez in Mexico City. During the meeting, the group discussed their plans to kill enemies of their interests, including Amado Carillo, a rival drug trafficker.

Soto recounted another incident in March, 1995, during which he was told by members of the AFO that Valdez and others participated in the assassination of a man named "Endir" who was the cousin of Manolo Rico. Soto extensively describes other, numerous criminal activities of the AFO. He also stated that it was Valdez who assigned him the code name "F7".

(4) *Alejandro Enrique Hodoyan Palacios* —In his November 30, 1996 deposition, Alejandro not only discussed the murder of Gallardo and Sanchez, but he also discussed other criminal activity involving the AFO and including the activities of Respondent Valdez. The various activities included a number of incidents of transportation of illegal drugs and homicide. Respondent's roles and activities in these regards is specifically referenced.

(5) *Gilberto Vasquez Culebro. aka "Cachuchas"* —In his September 30, 1996, declaration before an agent of the Mexican Federal Public Prosecutor, Gilberto Vasquez Culebro, aka "Cachuchas", (hereinafter Vasquez), declared that Valdez was a member of the AFO and that, in March, 1995, Valdez was in the company of the other AFO members, including, Eduardo Leon, aka "Abulon", Contreras, and Reyes.

Respondent's objections to this evidence and his explanatory evidence have already been addressed, and rejected. Mexico's evidence does support a finding of probable cause with regard to the criminal association charge.

The testimony of the various witnesses, including Miranda and Alejandro provide competent evidence for an assessment of probable cause to believe that the crime of criminal association (conspiracy) has been committed and that Respondent is involved therein. The evidence tying Valdez to the murder of Gallardo and Sanchez itself, given the numbers of other individuals involved, supports the criminal association charge. The witnesses go on to attribute a number of other incidents based upon their personal knowledge occurring since 1994 which are competent for a finding of probable cause on this charge as well. The witnesses all identify Respondent as the perpetrator in these regards. Based on the above evidence, this Court finds that there is probable cause to believe that Valdez committed the crime of criminal conspiracy as alleged in the extradition request.

### The Court Will Not Create a Humanitarian Exception In This Case

 Respondent urges that this Court decline extradition based upon a "humanitarian exception" in that he is likely to be tortured based upon his alleged relationship to the Arellano–Felix brothers.[48] Authority for this proposition is gathered from dicta in some case law in that there is no direct authority for this proposition. An analysis of whether this Court should enact a humanitarian exception into foreign extradition begins with a recognition of the rule of non-inquiry. *Emami v. United States District Court for N. District of California,* 834 F.2d 1444, 1453 (9th Cir.1987). Under that rule, "an extraditing court will generally not inquire into the procedures or treatment which await a surrendered fugitive in the requesting country." *Arnbjornsdottir–Mendler v. United States,* 721 F.2d 679, 683 (9th Cir. 1983). "The rationale is that such matters are to be determined solely by the executive branch." *Id.* "The Secretary of State has sole discretion ... to refuse extradition on humanitarian grounds because of the procedures or treatment that await the surrendered fugitive." *Quinn v. Robinson,* 783 F.2d 776, 789, 790 (9th Cir.1986). The Courts have chosen to defer questions re-

garding the procedures or treatment that might await an individual on extradition to the executive branch because of its exclusive power to conduct foreign affairs. *United States v. Manzi,* 888 F.2d 204, 206 (1st Cir. 1989), *cert. denied,* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990). In *Escobedo v. United States,* 623 F.2d 1098, 1107 (5th Cir. 1980), the court refused to decide whether the accused might be tortured or killed if surrendered to the requesting nation because this argument raised an "issue that properly falls within the exclusive purview of the executive branch" *Id.* (quoting *Sindona v. Grant,* 619 F.2d 167, 174 (2d Cir.1980)).

 Valdez relies on *Gallina v. Fraser,* 278 F.2d 77, 78 (2d Cir.1960), *cert. denied,* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960), as the case that establishes the possibility of a "humanitarian exception" based on the "federal court's sense of decency." The holding in *Gallina,* however, offers no support for Valdez' claim. In *Gallina,* commissioner found the appellant subject to the extradition in Italy. Appellant then filed a writ of habeas corpus with the district court. The court denied the writ. Appellant appealed the habeas corpus denial to the Second Circuit. Appellant asked the Court of Appeals to stop his extradition because he had been convicted in absentia in Italy and, therefore, would be imprisoned without trial, be unable to confront his accusers and would not be able to conduct a defense.

The Second Circuit affirmed the denial of the habeas corpus petition. In making this ruling, the Court of Appeals stated:

> We have discovered no case authorizing a federal court, in a habeas corpus proceeding challenging the extradition from the United States to a foreign nation, to inquire into the procedure which awaits the relator upon extradition. . . .

> The authority that does exist points clearly to the proposition that the conditions under which a fugitive is to be surrendered to a foreign country are to be determined

---

**48.** Evidence submitted in this regard includes the "recantations" regarding the use of torture to extract statements from the witnesses as well as the alleged abduction of Alejandro. Print material from AMNESTY INTERNATIONAL has also been filed.

solely by the non-judicial branches of the government.

*Gallina v. Fraser,* 278 F.2d 77, 78–79.

After making its holding, the *Gallina* court did state that a case might occur in which the extraditee "would be subject to procedures or punishments so antipathetic to a federal court's sense of decency as to require re-examination of the [the general principle upholding extradition.]" *Id.* at 77, 78.

The Ninth Circuit has labeled the above statement from *Gallina* as speculation. 834 F.2d 1444, 1453. Another court has correctly characterized the above sentence from the Second Circuit as "dicta." *Matter of Extradition of Koskotas,* 127 F.R.D. 13, 22 (D.Mass.1989).

There is no legal support for a judicially created "humanitarian exception" in an extradition proceeding. The precedent of the long line of cases discussed above, supports the proposition that the consideration of a "humanitarian exception" should be left to the Department of State where it rightly belongs. The contours of the extradition proceeding were shaped by the Treaty and statute. The contours do not lend themselves, nor invite the type of inquiry required to evaluate the humanitarian concerns of the magnitude suggested by Respondent. As more clearly established by case law, the Court should not usurp the constitutional authority of the State Department in this respect. Additionally, it is not the business of the United States Courts to assume responsibility for supervising the integrity of a judicial system of another sovereign nation; such an assumption would directly conflict with the principal of comity on which extradition is based. *Jhirad v. Ferrandina,* 536 F.2d 478 (2d Cir.1976).

### Conclusion

Probable cause exists to believe that the Respondent committed the offenses of homicide and criminal conspiracy as charged against him in Mexico. These offenses are extraditable offenses under the extradition treaty between Mexico and the United States.

The extradition request and supporting documents are admitted into evidence during the hearing and the post hearing submissions are properly authenticated or otherwise admissible within the discretion of the Court.

Therefore, the Court will certify the above and all documents admitted into evidence to the Secretary of State. The Department of Justice shall prepare a certification consistent with this memorandum as required by 18 U.S.C. § 3184.