**In the Matter of the EXTRADITION OF Jose Cruz CONTRERAS.**

**Misc. A. No. M–92–012–M.**

United States District Court,
S.D. Texas,
McAllen Division.

Sept. 9, 1992.

Michael F. McCormick, Patti Booth, and Allan Hoffman, Asst. U.S. Attys., McAllen, Tex., for petitioner.

J.A. "Tony" Canales of Canales & Simonson, Corpus Christi, Tex. and J. Roberto Rodriguez, McAllen, Tex., for respondent.

## OPINION AND ORDER

MALLET, United States Magistrate Judge.

Pending before the Court is the extradition request by the Republic of Mexico for one of its citizens here in the United States

of America. Jose Cruz Contreras [hereinafter Contreras] was under indictment in Mexico for weapons smuggling and amassing of arms. On behalf of Mexico, the United States Government, as Petitioner, filed the extradition documents and represented Mexico's interest in these proceedings. The issue is whether to allow recanting testimony into evidence. The Court holds the recantations admissible and, due to insufficient evidence, denies the request for extradition.

The proceedings were instigated on May, 6, 1992 when this Court issued a warrant for the provisional arrest for extradition purposes of Contreras pursuant to Article 11 of the "Extradition Treaty between the United Mexican States and the United States of America" [hereinafter Treaty]. *See,* 31 UST 5059; TIAS 9656; *see also,* 18 U.S.C. 3184. The provisional arrest warrant was executed on June 22, 1992 in Corpus Christi, TX. Per Article 11(3) of the Treaty, the party requesting extradition then had sixty (60) days to file a "Requisition in the United States for Extradition" [hereinafter Petition for Extradition]. The Petition for Extradition and accompanying documentary evidence were timely filed by the United States on July 20, 1992, and a probable cause hearing was held July 23–24, 1992.

### Facts

On January 10, 1989, in Madero, Tamaulipas, Federal Police and the Mexican Army raided the residence of oil workers union leader Joaquin Hernandez Galicia [hereinafter Galicia] to execute a "Proceedings of Physical Inspection" (*i.e.* search warrant). Confiscated were approximately eighteen (18) cases of weapons containing about two hundred (200) Uzi submachine guns and about 25,000 rounds of ammunition. Over forty (40) people were arrested, including Galicia, at this and other locations.

Written confessions were signed by eleven (11) of those arrested at Galicia's residence; all of which identified Contreras as the source of the weapons. These confessions were the basis for the indictment in Mexico against Contreras and are the crux of the documentary evidence included in the Petition for Extradition.

Contreras was previously a politician in Mexico and had been mayor of the border town of Reynosa, Tamaulipas. He had become a successful businessman in South Texas. Galicia's confession states that he had procured the help of Contreras in obtaining weapons because of the latter's proximity to the border.

All of the confessions relate that on December 10, 1988, the contraband was delivered to the home of Galicia by Contreras, a Hidalgo County, Texas law enforcement officer, and others. The weapons in question were fully automatic and were of the type sold by the manufacturer in Belgium exclusively to certain governments, and not sold commercially over the open market. The Mexican Government did purchase this type of machine gun, but such weapons were reserved for use solely by its armed forces.

Contreras was indicted in Mexico on September 25, 1989 for the crimes of amassing arms and smuggling of firearms in violation of Articles 83 bis. and 84 of the Federal Law of Firearms and Explosives. These two (2) charges are included in the laundry list of extraditable offenses set forth in the Appendix, section 19 of the Treaty.

Findings of Fact and Conclusions of Law

### 1. *Pre-requisites.*

The treaty between Mexico and the United States, as requesting and requested countries, respectively, has been in effect since January 25, 1980. *See generally, Argento v. Horn,* 241 F.2d 258 (6th Cir.1957), *cert. denied,* 355 U.S. 818, 78 S.Ct. 23, 2 L.Ed.2d 35 (1957). Therefore the controlling document in these proceedings is the Treaty, which, along with 18 U.S.C. 3184, requires that the United States Government, on behalf of Mexico, include in its Petition for Extradition:

1) a statement of the facts of the case;
2) the text of the legal provisions describing the essential elements of the offense;
3) the text of the legal provisions describing the punishment for the offense;

4) the text of the legal provisions relating to the time limit on the prosecution or the execution of the punishment of the offense and;

5) the facts and personal information of the person sought which will permit his identification and, where possible, information concerning his location.

31 UST 5059; TIAS 9656. All the above were complied with by the Government. Additionally, when the person sought has not yet been convicted, then Article 10(3) of the Treaty requires the Petition for Extradition to include:

6) a certified copy of the warrant of arrest issued by the judge or judicial officer [in Mexico]; and

7) evidence which, in accordance with the laws of the requested party, would justify the apprehension and commitment for trial of the person sought if the offense had been committed there.

31 UST 5059; TIAS 9656. The sixth element was also complied with and is not at issue.

As to the seventh element, however, 18 U.S.C. 3184 states that "[the judge] deems the evidence sufficient to sustain the charge under the provisions of the ... treaty ...", and Article 10(3) of the Treaty, *supra*, mandates a finding of sufficient evidence as would be required in the jurisdiction of the requested party. Therefore, the level of sufficient evidence in the United States, as the requested party, is a finding of probable cause. *See, Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir.1981), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

> Probable cause is the level of evidence: sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.

*Matter of Extradition of Atta*, 706 F.Supp. 1032, 1050 (E.D.N.Y.1989), *aff'd*, 910 F.2d 1063 (2nd Cir.1990); or as stated by the Fifth Circuit, "the existence of a reasonable ground to believe the accused guilty". *Escobedo v. United States*, 623 F.2d 1098, 1102 (5th Cir.1980), *cert. denied*, 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980);

*Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir.1969); *Matter of Extradition of Russell*, 805 F.2d 1215, 1216 (5th Cir.1986). This finding must be made before the Judge can certify the matter over to the Secretary of State for possible extradition. *See, Matter of Extradition of Atta*, 706 F.Supp. at 1050.

*2. Probable Cause Hearing.*

 The probable cause hearing is akin to a preliminary hearing (*see, Sayne v. Shipley*, 418 F.2d at 685), and not to determine whether the accused is guilty or innocent. *See, Hooker v. Klein*, 573 F.2d 1360, 1968 (9th Cir.1978), *cert. denied*, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978). At the hearing, the rules of evidence and of criminal procedure do not apply, which, procedurally, appears to make for a broad hearing. *See*, FED.R.EVID. 1101(d)(3), FED. R.CRIM.P. 54(b)(5), respectively; *but see*, 18 U.S.C. 3190 (evidence must still be authenticated). Substantively, however, the scope of the hearing is very limited. Evidence explaining away or completely rebutting the existence of probable cause appears to be the only evidence admissible. *See, Sayne v. Shipley*, 418 F.2d at 685. If the evidence merely controverts the Government's probable cause evidence, or raises a defense, then it is excluded. *See, Charlton v. Kelly*, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *Sayne v. Shipley*, 418 F.2d at 685 (evidence of insanity inadmissible); *Hooker v. Klein*, 573 F.2d at 1368 (alibi or other evidence contradicting proof of probable cause inadmissible). In deciphering the difference between admissible and inadmissible probable cause evidence, the District Court in *Matter of Sindona* stated:

> [t]he distinction between "contradictory evidence" and "explanatory evidence" is difficult to articulate ... In admitting "explanatory evidence," the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause ...

*Matter of Sindona*, 450 F.Supp. 672, 685 (S.D.N.Y.1978). The policy for limiting the

evidence is the likelihood that the probable cause hearing would balloon into a trial on the merits. *See, Id.; Eain v. Wilkes,* 641 F.2d at 511.

■ In the case at bar, the evidence offered by the Government to show probable cause were eleven (11) confessions (*i.e.* Petitioner's exhibit # 1). Respondent challenged the voluntariness of these confessions, and attempted to show that they were coerced and subsequently recanted at the first opportunity in a judicial hearing.

The issue, then, is whether recantation testimony is deemed rebutting or explanatory which would be admissible since it explains away or destroys the existence of probable cause. The Fifth Circuit has not yet determined this issue, but it is obvious to this Court that if the only evidence of probable cause were the confessions, and if sufficiently recanted, then the existence of probable cause would be negated. The Fifth Circuit alluded to this in *Escobedo v. United States,* where in a footnote they stated:

> [t]he Extradition Documents include confessions made to Mexican authorities by Escobedo ... Petitioners contend that these confessions cannot be used for the purpose of establishing probable cause because they were obtained by means of torture. We do not reach this contention because we conclude that the evidence independent of the confessions, discussed above, establishes probable cause ...

*Escobedo v. United States,* 623 F.2d, at 1102 n. 13. With this language, it is obvious the Fifth Circuit has left the door open to a scenario, as is before the Court today, where, absent the confessions due to their unreliability, no probable cause evidence remains.

After the raid of Galicia's residence, inculpating statements were adduced from eleven (11) of those arrested, to wit: Galicia, Mauro Estrada Cruz, Carlos Anselmo Raga Calderon, Fidel Cardenas Saumoza, Saul Castillo Castillo, Jesus Zuniga Gonzalez, Jose Aguilar Guzman, Antonio Torres Zarate, Ramon Sanchez Jaramillo, and Rafael Zuniga Sandoval on January 11, 1989, and from Jose Manuel Sanchez Medina on January 10, 1989. *See,* Petitioner's exhibit # 1, Petition for Extradition, Annex 8–13. The confessions themselves were not written with first person grammar, but were affidavits from the Mexican officials who were present when the "deponents" gave their statements. At the end of each deposition, the deponents signed the statements along with the signature of the government's attesting witnesses.

The information from these statements is that most of those present at Galicia's residence were his bodyguards, but a few were regular employees. None were paid by Galicia since they received compensation from Petroleos Mexicanos (*i.e.* Pemex) even though they did not work there. One (1) month prior to the raid, Contreras delivered and personally unloaded weapons and ammunition at the home of Galicia. Galicia had given his employees strict orders not to let anyone enter the premises. When the Government arrived to execute the Proceedings of physical inspection, Galicia's bodyguards started shooting; thus, killing a federal prosecutor. The Mexican Army did not return fire, but merely shot in the air.

These statements were the sum of the Government's substantive evidence, and, facially, would appear to meet the probable cause standard. However, Respondent offered, and the Court admitted, evidence explaining these statements and the circumstances surrounding them.

Cesar Fentanes [hereinafter Fentanes] testified that he was an attorney from Mexico and represented Galicia and the other forty (40) detainees from the raid. According to his testimony, the army did not allow him to confer with any of his clients on the day of their arrest. He tried again to speak with them the next day without success. It was not until the following day that he saw Galicia and his ten (10) employees at the Judicial Declaration Hearing, which was their first appearance in court. By the time the Declaration Hearing was held on January 12, 1989, Galicia and the others had given their statements and had already signed them.

Fentanes explained that at this hearing, the Judge reads the statement and the defendant makes a "declaration" as to whether it is an accurate representation of his intended statement and confession; if correct, the defendant adopts the statement in open court. Respondent's exhibits # 201–211 are the written declarations given to the Judge at the Judicial Declaration Hearing [1]. According to Fentanes, the Judge first inquired whether the signature at the bottom of the statement was, in fact, their signature. Each of the eleven (11) defendants answered affirmatively. The Court then questioned each about the content of their statement, and every one of them recanted the statement and did not adopt it as true.

In Galicia's statement given the day before, it states:

> [i]n answer to special questions, the deponent further declared that he has been treated decently, from the time of his arrest until now, by the agents involved in his arrest, as well as by those that intervene in taking his deposition at this moment.

Petition for Extradition, Annex 8, Deposition of Joaquin Hernandez Galicia. Whereas, in his declaration, he explained to the Judge that the statement he now had in court was not the original one given, but was the one he was forced to sign.

> "[F]rom what I have heard ... everything is a dirty infamy, prefabricated ... Those written pieces of my declarations are not the one I signed, or the ones I signed are not incriminating as are the ones that appear here before the secretary. The other declaration that has some parts of this, was made by me, first, because they threatened me ... just as they took me out in my underwear, at gunpoint; besides, in the prison in which I was I saw my comrades go by,

at first standing straight, and coming back almost dragging their feet; I heard water being flushed in the toilets, and screams from my comrades; this was almost continuous, and they also told me that my family had been kidnapped and that if I went on without signing the declarations that were convenient to the Attorney General's Office, I would never see them again. I realize that even within their rudeness, the agents of the Federal Judiciary Police were considerate with me, though not with my comrades, that, as I have stated, I heard scream or complain, as we know that sometimes they pour carbonated water through their nostrils, or they put their mouths inside the toilet basin to coerce them. I didn't want my comrades to keep suffering because all the investigations were going to take several days, and above all, because the workers may have been killed, and that is why I state that the said declaration is not the one that I approved at the beginning, which was almost not incriminating at all; ... and in what concerns me, I emphasize being innocent, and I ask for time to talk to my attorneys, and if this Honorable Court grants me permission, I will retain them to legally defend our innocence. What I have just said was orchestrated so that with prefabricated accusations we remain permanently in jail ..."

Respondent's exhibit # 201 at unnumbered pages 3–5.

Fidel Cardenas Saumoza recanted his prior statement and told the court of his coerced signature:

> the declaration submitted in the preliminary interrogation he does not recognize the contents that he does recognize his signature on the document as being written by his own handwriting, that he

---

**1.** Respondent exhibit number:
201—Declaration of Joaquin Hernandez Galicia;
202—Declaration of Mauro Estrada Cruz;
203—Declaration of Carlos Anselmo Raga Calderon;
204—Declaration of Fidel Cardenas Saumoza;
205—Declaration of Jose Manuel Sanchez Medina;
206—Declaration of Saul Castillo Castillo;
207—Declaration of Jesus Zuniga Gonzalez;
208—Declaration of Jose Aguilar Guzman;
209—Declaration of Antonio Torres Zarate;
210—Declaration of Ramon Sanchez Jaramillo; and
211—Declaration of Rafael Zuniga Sandoval.

signed them under torture and he was never permitted to read what he was signing and they never read to him either as to the facts ... [after the raid of Galicia's house] we were put into a plane and taken to the General Procurator of the Republic, himself and the other people without knowing how many they were, where they were interrogated himself being interrogated about five time, when finally they presented him with the document that has been read in this court, they took it and stated they were going to make some corrections, returning him to his cell, and calling him again, he asked for his declaration to be read to him again so he could see it if was the correct document, but he was not permitted to do so, arguing that it was the same one and since he refused to sign, he was taken to a room where they put a plastic bag over his face, asking him if he was going to sign, to which he refused, following this they removed the bag and introduced something strange into his mouth and pouring water into his nose, covering his face, and so he agreed to sign ...

Respondent's exhibit # 204 at unnumbered pages 2–3.

Jose Aguilar Guzman explained to the Judge the circumstances surrounding his signing the statement:

he agrees with the signature that appears in his preview declarations which was put by his own hand, but that in the matter of the content of such declarations he does not recognize it and that if he did sign them was because he was under physical pressure and dead threats for him and his family, that the injuries that he received in his legs, splints chest, head and he was given around three liter of water to drink in the occurrence the secretary certifies that he has the accused at his sight and that he shows injuries in the left leg, bruises on the splint and contusions on the knee, also in the right leg bruises on the flint an injury on the left eye also a bruise, on the middle part of the chest also an injury, he does not know who or whom caused

this injuries because he was blinded in this occurrence ...

Respondent's exhibit # 208 at unnumbered page 2.

Antonio Torres Zarate recanted his statement and explained:

[he] disagree[d] with the contents of the document submitted before the Federal Social Representative, but that he does recognize his signature being the one he uses to sign public as well as private documents ... "I got to Joaquin Hernandez Galicia's house at about eight in the morning of January tenth of this year, I stayed outside talking with some people that where there, at that time I saw a military truck approaching, but I did not give it any notice since it is a very busy street which is between Madero and Tampico, then I did notice because I heard a bump from a vehicle like when you go up a driveway and I saw it go into Mr. Hernandez Galicia's house, I went inside of the house and immediately observed a young lady that was outside by that I mean she was outside Mr. Hernandez Galicia's gate, I approached the young lady and in that precise moment the military truck turned the corner, breaking loudly, which made my notice that detail and a lot of soldiers immediately started to get the truck, they were about forty or fifty screaming 'everybody hit the ground and put hand behind you head' they shot up to the air; we immediately hit the ground the people that were there, following the soldiers orders, the soldiers then opened the gate and went in that after that he could no longer see what happened because they ordered us not to move and they hit me on the shoulders with the rifle butt ... they took us aboard a plane and we were taken to Mexico District Federal and then they again took us on a truck ... to the General Prosecuter (sic) and we got there until two in the morning, there we put in cells and during the day we were taken out to declare which is when I made my statement of the actions and that I am stating now while there someone said he was giving to clarify my declaration, a correction in my declara-

tion having me standing against a wall with my hands behind my back [for] about one and a half hours after a time they brought back the document and told me to sign it, I answered with pleasure, but first I have to read it before signing, they told me in a nice way that was not necessary since it was the same declaration I had previously given, I then refused to sign unless I was permitted to read it, to which they answered in an awful and nasty and started to kick me, [they] hit me and slapped me and told me I had to sign it or else they would kill me, my wife and daughters who were outside and that they were going to do it in front of me and that they were going to take me to a Military Camp and kill me and I replied that if they were going to kill me for not letting me read a document before signing it to go ahead and do it, so they beat me again so badly that I signed it without reading it."

Respondent's exhibit # 209 at unnumbered pages 2–3.

Ramon Sanchez Jaramillo stated:

he recognizes his signature by his own handwriting and that he does not agree with the mentioned declaration since he does not even know the man ... [H]e was heading to the Regional Hospital to see a specialist that was treating his mother; that he is not familiar with weaponry and had no idea of the existence of those weapons in the said house; that he stated on that place due to the fact that he saw a lot of people, that it is the truth that he was hired worker at the house of Joaquin Hernandez Galicia; that when he saw all of the comotion (sic) was surprised, that he did not state such declaration, but was only given to him to be signed, that he is unaware of the facts dealing with this case ...

Respondent's exhibit # 210 at unnumbered page 2.

Rafael Zuniga Sandoval stated:

he does not agree with the contents of said declaration because it does not contain the true facts; that he acknowledges as his the signature that authorizes it because he signed, and adds that what he

[had actually said was] that he was coming from his house on the way to the grocery store located one block away from the home of Joaquin Hernandez Galicia, and seeing a lot of people there and out of curiosity he went to see what was happening; that this happened around ten a.m. and was informed by the people there that Mr. Joaquin was not longer there, that he had been detained by soldiers and at that time the judiciary police agents arrived, and upon seeing him on the sidewalk outside Don Joaquin's home they detained him, put him on a car and threw him on the floor facing downwards, till the moment in which they brought him to Mexico City ...

Respondent's exhibit # 211 at unnumbered page 3. All eleven (11) original statements were retracted at the declaration hearing.

*Imprimis*, the Court must decide whether the original statements were sufficiently recanted. Obviously, the Court must be concerned with an oscillating story, but in the case at bar, the information given at the declaration hearing has more indicia of truthfulness than the original statements. Persuasive is the fact that the original statements were recanted at the first opportunity after being given. The judicial process of Mexico is set up to filter out involuntary statements. After a statement is given, then the same statement must be declared in open court with the court's assessment of the circumstances surrounding the statement. As shown above, the defendants took the opportunity to retract the prior statements; knowing they may have subjected themselves and their families to retribution. Also, the incriminating statements were not of the person's own making, but were pre-written statements that only required the defendant's signature. Finally, if true, the facts expose the coercive treatment each was subjected to, and, as in the case of Jose Aguilar Guzman, the results of such abuse were indicated on the record.

The Court has no doubt that the original statements were not given voluntarily. The defendants were not allowed to speak

to their attorney before they recanted their original statements at the hearing. The likelihood of them all fabricating their recantations under the conditions outlined in the declaration exhibits is doubtful. Any indicia of reliability would be on the subsequent retractions.

As stated *supra*, the issue, then, is whether recantation testimony is deemed rebutting or explanatory which would be admissible. If excluded, the record is devoid of any other evidence showing probable cause.

Not all circuits allow recanting testimony. *See, Abu Eain v. Adams*, 529 F.Supp. 685, 691 (N.D.Ill.1980) (evidence of a recanted statement was omitted). Recanting testimony also was barred by the Seventh Circuit in *Eain v. Wilkes*, but under a completely different set of circumstances. In *Eain v. Wilkes*, extraditees complained that the translation of the inculpating statements were inherently suspect, and that when the statements were made, the extraditees mistakenly believed their statements could not harm them. *See, Eain v. Wilkes*, 641 F.2d at 511. Additionally, the alleged recantations were made by the extraditees to their attorneys. *Id.* at 511. In the case at bar, however, the eleven (11) defendants knew of the inculpatory effect of the original statements which is why they refused to sign them. It was not until they were coerced, some by torture, that each signed statements which were prepared for, not by, them. The original statements were then recanted at the first possible opportunity, and done so in open court.

■ The facts today do not conflict with the holdings in *Eain* or *Abu Eain*. Obviously, where the indicia of reliability is on the prior inculpating statement, then a recantation, if admitted, would not negate the existence of probable cause; or if the recantation only controverted a prior inculpating statement, then it would not rebut the probable cause evidence. However, where a prior statement is shown to be coerced and the indicia of reliability is on the recantation, then the subsequent statement negating the existence of probable cause is germane. Such relevance was noted by the District Court in *Gill v. Imundi*:

> [t]hus no cases hold, as the government would have this court, that an adjudication in the courts of the requesting country that the very recanted statement upon which the requesting country here relies in an extradition proceeding is untrue and involuntary, is irrelevant to the certification ruling.

*Gill v. Imundi*, 747 F.Supp. 1028, 1046 (S.D.N.Y.1990). The recanting statements not only are relevant, but under the facts today, are persuasive.

In *Republic of France v. Moghadam*, 617 F.Supp. 777 (N.D.Cal.1985), the District Court similarly held that although an accused could not introduce evidence that was merely contradictive, he could introduce recantation evidence rebutting probable cause. The District Court stated:

> [t]he recantation evidence here is critical and must be given substantial consideration for it goes to more than just the credibility of a witness, it negates the only evidence of probable cause. Furthermore, the substance and circumstances of the recantation indicate that it has more indicia of reliability than the original accusations.

*Republic of France v. Moghadam*, 617 F.Supp. at 783. Such is the case at bar where the lack of credibility is on the original statement and the indicia of reliability is with the recantation. Furthermore, without the inculpatory statements, no other evidence of probable cause exists.

## CONCLUSION

Under the terms of the Extradition Treaty and 18 U.S.C. 3184, the Government must show probable cause before a certification of extradition can be sent to the Secretary of State. The burden of proof has not been met by the Government. Quoting U.S. District Judge Patel in *Republic of France v. Moghadam*, 617 F.Supp. at 784, counsel for Contreras stated in his closing remarks:

> [t]he harsh results of an erroneous extradition based on untrustworthy accusations [militate] against this Court apply-

ing too lenient standard of review in determining probable cause.

The original statements are untrustworthy and not credible, and no evidence has been submitted to believe Respondent committed the offenses charged.

It is, therefore, ORDERED, ADJUDGED, and DECREED that the Petition for Extradition of Jose Cruz Contreras be DENIED and that he be RELEASED from custody *instanter*.