**In the Matter of THE EXTRADITION OF CARLOS NAVA GONZALEZ**

No. MISC. M–02–003.

United States District Court,
S.D. Texas,
McAllen Division.

Jan. 8, 2004.

Luis A Martinez, Office of U S Attorney, McAllen, for United States of America, plaintiff.

Oscar Alvarez, Attorney at Law, McAllen, for in the Matter of the Extradition of Carlos Arnulfo Nava–Gonzalez, defendant.

### MEMORANDUM & CERTIFICATE OF EXTRADITABILITY

RAMOS, United States Magistrate Judge.

### I. Overview

The government of Mexico seeks the extradition of Carlos Arnulfo Nava González ("Respondent"), pursuant to the extradition treaty which entered into force between the United States of America and the United Mexican States on January 25, 1980.[1] (*See* Docket Entries # 1, 11.) The Mexican government desires to prosecute Respondent for offenses relating to the

---

1. *See* 31 U.S.T. 5059.

murder of Jesús Leonardo Alanís Ostos ("Alanís–Ostos"), and the attempted murder of Octavio Verástegui Ostos ("Verástegui–Ostos"), both of which occurred in Ciudad Mante, Tamaulipas, Mexico, during the early hours of June 6, 1999. (*See, e.g.,* Docket Entry # 11.) Respondent has raised defensive matters, primarily advancing a theory that the crimes were, in actuality, committed by hoodlums or ruffians (referred to in Spanish as "porros"). (*See, e.g.,* Docket Entry # 18.) Based on the matters explored in this memorandum, the undersigned shall certify Respondent's extraditability. *See* 18 U.S.C. § 3184.

## II. Factual and Procedural Summary

The facts relevant to this case, as set forth in the record, are rather dense.

That which follows, then, is a synthesis of the record. For ease of discussion, the factual and procedural summary is divided into five sections, addressing the following:

● the identity of the key persons with knowledge of or involvement in the underlying incident;

● the shooting of Alanís–Ostos and the initial investigation;

● the search for Respondent;

● the extradition proceedings against Respondent; and

● the *porrismo* phenomenon in Mexico.

### A. Key Persons with Knowledge of or Involvement in the Underlying Incident

| Name: | Basic data: |
| --- | --- |
| **Carlos Arnulfo Nava González** [2] | alleged gunman in the underlying crimes, Respondent in the present extradition request, and former highway patrolman with the *Policía Federal de Caminos;* present at D'Morados nightclub in Cd. Mante, Tamaulipas during the early hours of June 6, 1999 [3] |
| **Helen Sosa Rentería** [4] | Respondent's date/girlfriend at the time when the crimes were allegedly committed, and student at *Universidad Valle del Bravo;* present at D'Morados nightclub in Cd. Mante, Tamaulipas during the early hours of June 6, 1999 [5] |
| **María del Rosario Ugalde Cepeda** | Respondent's friend at the time when the crimes were allegedly committed; present at D'Morados nightclub in Cd. Mante, Tamaulipas during the early hours of June 6, 1999; also allegedly aided in the gunman's getaway from the crime scene [6] |
| **Belinda Camero Sandoval** | Respondent's friend at the time when the crimes were allegedly committed; present at D'Morados nightclub in Cd. Mante, Tamaulipas during the early |

2. While the original diplomatic note underlying this litigation indicated that the suspect's name is Carlos Nava González, it was later clarified that his complete name is Carlos Arnulfo Nava González. (*See* Docket Entries # 1, 3.)

3. (*See* Docket Entry # 1.)

4. Certain documents in the record refer to her as "Gelen." (*See* Docket Entry # 11, Formal Extradition Request, at Tabs # 5, 6, 9.)

Yet, in her personal sworn statement, she is referred to as "Helen" and "Helena." (Docket Entry # 18, Exhibit # 2.) Despite the inconsistencies, it is clear that the same person is being referred to throughout these documents.

5. (*See* Docket Entry # 11, Formal Extradition Request, at Tab # 9.)

6. (*See* Docket Entry # 11, Formal Extradition Request, at Tab # 9.)

| | |
|---|---|
| | hours of June 6, 1999; also allegedly aided in the gunman's getaway from the crime scene [7] |
| **Jesús Leonardo Alanís Ostos** | decedent and student at the time when the crimes were allegedly committed; present at D'Morados nightclub in Cd. Mante, Tamaulipas during the early hours of June 6, 1999 [8] |
| **Octavio Verástegui Ostos** | cousin of decedent and student at *Universidad Valle del Bravo* at the time when the crimes were allegedly committed; present at D'Morados nightclub in Cd. Mante, Tamaulipas during the early hours of June 6, 1999 [9] |
| **José Luis Osorio Nieto** | friend of decedent and student at the time when the crimes were allegedly committed; present at D'Morados nightclub in Cd. Mante, Tamaulipas during the early hours of June 6, 1999; allegedly a *porro* [10] |
| **José Luis Hernández Rodríguez** | friend of decedent and student at the time when the crimes were allegedly committed; present at D'Morados nightclub in Cd. Mante, Tamaulipas during the early hours of June 6, 1999 [11] |
| **Edik Martín Rodríguez Camacho** [12] | friend of decedent and student of *Universidad Autónoma de Tamaulipas* at the time when the crimes were allegedly committed; present at D'Morados nightclub in Cd. Mante, Tamaulipas during the early hours of June 6, 1999 [13] |
| **Ramón Bonilla Torres** | friend of decedent and student at the time when the crimes were allegedly committed; present at D'Morados nightclub in Cd. Mante, Tamaulipas during the early hours of June 6, 1999; allegedly a *porro* [14] |
| **Federico Wong** | friend of decedent and student at the time when the crimes were allegedly committed; present at D'Morados nightclub in Cd. Mante, Tamaulipas during the early hours of June 6, 1999 [15] |
| **Remigio Galindo García** | proprietor of D'Morados nightclub in Cd. Mante, Tamaulipas, and present there during the early hours of June 6, 1999 [16] |

7. (*See* Docket Entry # 11, Formal Extradition Request, at Tab # 9.)

8. (*See* Docket Entry # 11, Formal Extradition Request, at Tab # 2.)

9. (*See* Docket Entry # 11, Formal Extradition Request, at Tab # 5.)

10. (*See* Docket Entry # 11, Formal Extradition Request, at Tabs # 2, 6; Docket Entry # 18, Exhibit # 1.)

11. (*See* Docket Entry # 11, Formal Extradition Request, at Tab # 5.)

12. Certain documents in the record refer to him as "Edith," "Erick," "Edi," and "Edik." (*See* Docket Entry # 11, Formal Extradition Request, at Tabs # 5, 6.) The court notes that, in his personal sworn statement, he is referred to as "Edik." (*See* Docket Entry # 11, Formal Extradition Request, at Tab # 6.) Despite the inconsistencies, it is clear that the same person is being referred to throughout these documents.

13. (*See* Docket Entry # 11, Formal Extradition Request, at Tabs # 5, 6.)

14. (*See* Docket Entry # 11, Formal Extradition Request, at Tab # 6; Docket Entry # 18, Exhibit # 1.)

15. (*See* Docket Entry # 11, Formal Extradition Request, at Tab # 6.)

16. (*E.g.*, Electronic Recording of Hearing of October 15, 2003; *see also* Docket Entry # 18, Exhibit # 1.)

## B. The Shooting of Alanís–Ostos and the Initial Investigation

The record indicates that, on the evening of June 5, 1999 (which fell on a Saturday), Alanís–Ostos and Verástegui–Ostos left their homes in Xicoténcatl, Tamaulipas for a night of partying in Cd. Mante, Tamaulipas, accompanied by José Luis Osorio Nieto, José Luis Hernández Rodríguez, Edik Martín Rodríguez Camacho, Ramón Bonilla Torres and Federico Wong.[17] (*See, e.g.,* Docket Entry # 11, Formal Extradition Request, at Tabs # 5, 6.) Eventually, the group of friends from Xicoténcatl landed at D'Morados nightclub in Cd. Mante. (*Id.*) The group apparently dispersed within the nightclub, talking to friends and acquaintances. (*Id.*)

Also partying at D'Morados that night was Respondent, who at the time was working as a federal police officer based in Cd. Mante. (*See, e.g.,* Docket Entry # 11, Formal Extradition Request, at Tabs # 5, 6.) Respondent was, apparently, on a date that night with Helen Sosa Rentería, and they had attended a wedding reception that same evening prior to their D'Morados excursion. (*See, e.g.,* Docket Entry # 18, Exhibit # 2.) It seems that Respondent was living at Hotel Los Arcos at the time, which is located about 800 meters from D'Morados. (*See, e.g.,* Docket Entry # 11, Formal Extradition Request, at Tab # 9; Electronic Recording of Hearing of October 15, 2003.)

As the night of June 5th turned into the early hours of June 6th, the patrons of D'Morados continued partying, and some of them seem to have become rather intoxicated. (*See, e.g.,* Docket Entry # 18, Exhibit # 2.) Then, at about 3:30 a.m. on June 6th, two fights broke out almost simultaneously near the entrance of D'Morados among various individuals, including Respondent and some of the young men from Xicoténcatl. (*See, e.g.,* Docket Entry # 11, Formal Extradition Request, at Tabs # 5,6; Electronic Recording of Hearing of October 15, 2003.) When Remigio Galindo García—the proprietor of D'Morados—was able to access the area of the fights with a view towards breaking them up, he observed that at least four guys were physically beating Respondent. (Electronic Recording of Hearing of October 15, 2003.)

After the fisticuffs, Respondent was driven to Hotel Los Arcos by María del Rosario Ugalde Cepeda and Belinda Camero Sandoval. (*See, e.g.,* Docket Entry # 11, Formal Extradition Request, at Tab # 9.) Respondent seems to have retrieved a handgun at the hotel, and was then driven back to D'Morados by María del Rosario Ugalde Cepeda and Belinda Camero Sandoval. (*Id.*) A gunman then began firing outside of D'Morados, subsequently "burning rubber" as he made his hasty escape in a vehicle which appeared to be the same one which had dropped him off at the nightclub. (*See, e.g.,* Docket Entry # 11, Formal Extradition Request, at Tabs # 5, 6, 9.)

Alanís–Ostos received four gunshot wounds, and was taken to a local hospital by his friends, where he was pronounced dead. (*See, e.g.,* Docket Entry # 11, Formal Extradition Request, at Tabs # 2, 6, 7.) For their part, Verástegui–Ostos and Edik Martín Rodríguez Camacho received superficial wounds as a result of the scuffle. (*See, e.g.,* Docket Entry # 11, Formal

---

17. The court notes that both Cd. Mante and Xicoténcatl (which witnesses referred to colloquially as "Xico") are located in the southern portion of the State of Tamaulipas. According-ing to testimony, it takes from 20 to 30 minutes to drive from Xicoténcatl to Cd. Mante. (Electronic Recording of Hearing of June 19, 2003.)

Extradition Request, at Tab # 10.) When calm was restored, attention quickly turned to identifying the killer and solving the crime. (*See, e.g.,* Docket Entry # 11, Formal Extradition Request, at Tab # 4.)

The investigation of this case by authorities in Tamaulipas proceeded swiftly, yielding the following:

- On June 6, 1999 (and again on July 20, 2000), Verástegui–Ostos gave a statement identifying Respondent as the gunman. (*See, e.g.,* Docket Entry # 11, Formal Extradition Request, at Tabs # 6, 12.)
- On June 6, 1999 (and again on July 20, 2000), José Luis Hernández Rodríguez gave a declaration identifying Respondent as the gunman. (*See, e.g.,* Docket Entry # 11, Formal Extradition Request, at Tabs # 6, 12.)
- on June 7, 1999, Respondent was officially named as the chief suspect in the homicide of Alanís–Ostos and the attempted homicide of Verástegui–Ostos. (*See, e.g.,* Docket Entry # 11, Formal Extradition Request, at Tab # 11.)
- on June 8, 1999, an order for Respondent's arrest was issued in Mexico. (*See, e.g.,* Docket Entry # 11, Formal Extradition Request, at Tab # 16.)
- On July 20, 2000, José Luis Osorio Nieto gave a declaration identifying Respondent as the gunman. (*See, e.g.,* Docket Entry # 11, Formal Extradition Request, at Tab # 12.)
- On July 21, 2000, Edik Martín Rodríguez Camacho gave a declaration identifying Respondent as the gunman. (*See, e.g.,* Docket Entry # 11, Formal Extradition Request, at Tab # 13.)

Despite the efforts dedicated to the investigation of the crime, which are amply demonstrated by the record, Mexican authorities were not successful in bringing the gunman to justice on Mexican soil. At some point, however, Mexican authorities began to suspect that Respondent had fled Mexico, and they sought help through INTERPOL and from federal law enforcement authorities on this side of the border. *See Boletín No. 860/02, Procuraduría General de. la República* (Mexico City), *Fue Detenido en Estados Unidos el mexicano Carlos Arnulfo Nava González* (September 21, 2002), available online at: *http://www.pgr.gob.mx/cmsocial/bol102/sep/b86002.html* (last accessed December 9, 2003). (*See generally* Transcript of Preliminary Examination and Detention Hearing, at page 3.)

## C. The Search for Respondent

During 2002, deputies from the United States Marshals Service began to search for Respondent in South Texas. (*See generally* Transcript of Preliminary Examination and Detention Hearing, at pages 3, *et seq.*) It was determined that Respondent was employed in the Harlingen, Texas area, and that he had been living in Cameron County. (*Id.,* at pages 12—13.) Ultimately, Respondent was detained at the border port-of-entry in Brownsville, Texas. (*Id.,* at page 9.)

The case then moved on to the U.S. District Court for the Southern District of Texas, which has resulted in the current proceedings.

## D. The Extradition Proceedings Against Respondent

The U.S. Attorney, acting on behalf of the government of Mexico, filed its complaint on January 9, 2002, thereby initiating the current litigation in the U.S. District Court. (Docket Entry # 1.) The case was immediately referred to the undersigned.[15] Upon reviewing the com-

---

**15.** This fact is indicated by the docket records maintained by the U.S. District Clerk.

plaint, the issuance of an arrest warrant was ordered. (Docket Entry # 2.)

Respondent made his first appearance in this case on September 13, 2002. (Docket Entry # 3.) Thereafter, Brownsville attorney Everardo García entered his appearance on Respondent's behalf. (Docket Entry # 6.) On October 2, 2002, the government filed its "PRE–HEARING EXTRADITION MEMORANDUM." (Docket Entry # 8.)

By late-October 2002, Respondent had apparently changed plans with respect to his retained counsel, and he requested that McAllen-based attorney Oscar Alvarez be allowed to proceed on Respondent's behalf, which request was granted. (Docket Entries # 9, 10.) On November 8, 2002, the formal extradition request was filed. (Docket Entry # 11.) After being allowed some time to develop his case, Respondent filed his response to the extradition request on March 20, 2003. (Docket Entry # 18.)

In his response to the government's case for extradition, Respondent advances two main contentions. (Docket Entry # 18.) First, he states that he is a citizen of the United States of America.[19] (*Id.*) Second, he states that the fights which occurred on June 6, 1999 were instigated by *"porros"*

(*i.e.*, ruffians), who wrongly blamed the shooting on Respondent.[20] (*Id.*)

Respondent sought to have these proceedings abated on the grounds of his alleged United States citizenship. (Docket Entry # 20.) Respondent also sought to have this extradition case dismissed, arguing the following: that the identification techniques used in Mexico were impermissibly suggestive; that the request for extradition was impermissibly ambiguous in its use of the term "homicide"; and that the Mexican charging documents were fatally ambiguous or imprecise. (Docket Entries # 21, 22, 23.) The government responded to the foregoing arguments on May 22, 2003. (Docket Entry # 27.)

The extradition hearing commenced on June 19, 2003, with the government calling Verástegui–Ostos (an eyewitness to the crime) and José Luis Osorio Nieto (another eyewitness) as witnesses. (*See* Docket Entry # 28.) After the hearing had been adjourned, and having carefully studied the legal and factual issues, the undersigned denied Respondent's motions to abate and dismiss this case. (Docket Entry # 33.) The extradition hearing then resumed on October 15, 2003, with Respondent calling Remigio Galindo García (the proprietor of D'Morados) and Víctor

---

**19.** The question of Respondent's true citizenship is far from clear. Respondent has produced a copy of a Texas birth certificate which indicates that he was born in Cameron County, Texas on February 9, 1971. (Docket Entry # 20, Exhibit # 2.) Nevertheless, the Mexican government has supplied a copy of a Mexican birth certificate which indicates that Respondent was born in Ciudad Victoria, Tamaulipas on January 6, 1971. (Docket Entry # 11, Formal Extradition Request, at Tab # 15.) In view of this situation, the court feels compelled to consider the question of which of these documents is the true birth certificate for Respondent. It seems noteworthy that Respondent used the date of January 6, 1971 (the date from the Mexican birth

certificate) as his date of birth for official records related to his employment as a police officer in Mexico, which would tend to suggest the legitimacy of the Mexican document (and, thus, that the Texas document was, in all likelihood, fraudulently obtained). (Docket Entry # 11, Formal Extradition Request, at Tab # 14.) In any event, the resolution of this inquiry is not of consequential legal significance for the ultimate outcome of this case, as will be discussed in the analytical section of this memorandum.

**20.** The court will briefly discuss the Mexican social phenomenon of *porrismo* before commencing the analytical section of this memorandum.

Hugo López López (a Mexican educator and, essentially, an expert in *porrismo* ) as witnesses. (*See* Docket Entry # 38.) After the conclusion of the extradition hearing, Respondent filed his legal memorandum. (Docket Entry # 39.)

This litigation, then, is procedurally ripe for final disposition by the court.

### E. The *Porrismo* Phenomenon in Mexico

As previously mentioned, Respondent has suggested that he was framed in this case by "*porros* "—that is to say, by ruffians commonly associated with public universities in Mexico. (Docket Entry # 18.) Having reviewed the materials submitted by Respondent, and having conducted some research into this topic, the court recognizes that *porrismo* is, indeed, a counterproductive social phenomenon, the effects of which have been discussed in the highest levels of government in Mexico. (*See* Docket Entry # 18.) *See, e.g., Sesión de la Cámara de Diputados de la LVIII Legislatura, Día 7 de Noviembre de 2000,* available online at: *http://www.cddhcu.gob.mx/servddd/verest/1po00/071100.htm* (last accessed October 15, 2003). Further, press reports indicate that the *Universidad Autónoma de Tamaulipas* (the name of which is abbreviated "*UAT*") seems particularly beset by the negative and destructive activities of *porros. See, e.g.,* Karla Cabrera, *Pone 'candados' la UAT a porros, El Mercurio de Tamaulipas* (Cd.Victoria, Mexico), April 14, 2003, at 1A; Efraín Klérigan, *Pierde UAT última batalla, Reforma* (Mexico City), September 5, 2002, accessed online *via: http://busquedas.gruporeforma.com* (last accessed September 12, 2003). Suffice it to say, then, that *porrismo* is an altogether real social phenomenon in Mexico, notwithstanding the fact that Respondent's invocation of it in the

case at bar appears strained (as discussed in the analytical section of this memorandum).

### III. Analysis

 The primary concern in an international extradition matter is to deliver the extraditee to the requesting nation. *Extradition of Nacif–Borge,* 829 F.Supp. 1210, 1213 (D.Nev.1993) (concerning Mexican extradition request). Additionally, from the outset, the court bears in mind that extradition is *sui generis* in nature, neither civil nor criminal. *See Extradition of Massieu,* 897 F.Supp. 176, 177 (D.N.J. 1995) (concerning Mexican extradition request). Restated somewhat differently, it has been noted that each separate extradition treaty between the United States and a foreign nation is *sui generis,* and as a contract between two sovereigns, sets forth its own law. *See Extradition of Nacif–Borge,* 829 F.Supp. at 1213.

Following the United States–Mexico extradition treaty, then, the court must address the following:

- whether the charged offenses are covered by the extradition treaty,
- whether the charged offenses are time-barred,
- whether the evidence justifies commitment for trial, and
- issues related to Respondent's nationality.

*See* 31 U.S.T. 5059, arts. 2, 3, 7, 9. The resolution of these issues, as discussed herein, leads to the inevitable conclusion that a certificate of extraditability should issue from this court, with the ultimate decision to extradite being made by the Secretary of State.

### A. Are the charged offenses covered by the extradition treaty?

 According to the principle of "dual criminality," the act on which the extradition request is founded must be

considered a crime in both jurisdictions. *See, e.g., Extradition of Diaz Medina,* 210 F.Supp.2d 813, 816 (N.D.Tex.2002) (concerning Mexican extradition request); *Extradition of Garcia,* 890 F.Supp. 914, 919 (S.D.Cal.1994) (concerning Mexican extradition request). Pursuant to Article 2 of the extradition treaty, the offenses for which the government of Mexico seeks to prosecute must be punishable in both the United States and Mexico by deprivation of liberty, the maximum of which shall not be less than one year. 31 U.S.T. 5059, art. 2. Of course, the determination of whether a crime is within the provisions of an extradition treaty is within the sole purview of the requested country. *See, e.g., Extradition of Valdez–Mainero,* 3 F.Supp.2d 1112, 1115 (S.D.Cal.1998) (concerning Mexican extradition request).

The court has, therefore, considered whether the dual criminality requirement is satisfied for *homicidio* and *homicidio en grado de tentativa* and, based on the discussion below, the court concludes that the dual criminality requirement is indeed satisfied. *See* 31 U.S.T. 5059, art. 2.

### 1. Homicidio

■ The offense of murder is included within the appendix to the extradition treaty; thus, following Article 2, § 1, of the treaty, it is an extraditable offense if punishable in both countries by deprivation of liberty the maximum of which shall not be less than one year. 31 U.S.T. 5059, art. 2. Pursuant to *Artículo* 333 of the *Código Penal* for the State of Tamaulipas, simple intentional homicide is punishable by a maximum term of imprisonment 16 years; alternatively, assuming the perpetrator was provoked into a fight which resulted in homicide, then *Artículo* 334 of the *Código Penal* for the State of Tamaulipas would provide for a maximum term of imprisonment of 6 years. Pursuant to Texas Penal

Code §§ 12.32, 19.02, murder is generally punishable in this jurisdiction by a maximum term of imprisonment of life or 99 years; alternatively, assuming the murder was committed under the immediate influence of sudden passion arising from an adequate cause, then Texas Penal Code §§ 12.33, 19.02 provide for a maximum term of imprisonment of 20 years. Although the United States and Mexican statutes may not use precisely the same words, the undersigned finds that they are substantially analogous. *See, e.g., Extradition of Ramos Herrera,* 268 F.Supp.2d 688, 695 (W.D.Tex.2003) (concerning Mexican extradition request). Based on the foregoing, the court concludes that *homicidio* is an extraditable offense under the treaty. *See* 31 U.S.T. 5059, art. 2.

### 2. Homicidio en grado de tentativa

■ Following Article 2, §§ 1, 4(a), of the treaty, attempted murder is an extraditable offense if punishable in both countries by deprivation of liberty the maximum of which shall not be less than one year. 31 U.S.T. 5059, art. 2. Pursuant to *Artículos* 79, 333 of the *Código Penal* for the State of Tamaulipas, attempted simple intentional homicide is punishable by a maximum term of imprisonment 10.66 years; alternatively, assuming the perpetrator was provoked into a fight which resulted in attempted homicide, then *Artículos* 79, 334 of the *Código Penal* for the State of Tamaulipas would provide for a maximum term of imprisonment of 4 years. Pursuant to Texas Penal Code §§ 12.33, 15.01, 19.02, attempted murder is punishable in this jurisdiction by a maximum term of 20 years; alternatively, assuming the attempted murder was committed under the immediate influence of sudden passion arising from an adequate cause, then Texas Penal Code §§ 12.34, 15.01, 19.02 provide for a maximum term of imprisonment of 10 years. Again, al-

though the United States and Mexican statutes may not use precisely the same words, the undersigned finds that they are substantially analogous. *Extradition of Ramos Herrera*, 268 F.Supp.2d at 695. Based on the foregoing, the court concludes that *homicidio en grado de tentativa* is an extraditable offense under the treaty. *See* 31 U.S.T. 5059, art. 2.

## B. Are the charged offenses time-barred?

Extradition shall not be granted when the prosecution or the enforcement of the penalty of the offense for which extradition has been sought has become barred by lapse of time according to the laws of either Mexico or the United States. 31 U.S.T. 5059, art. 7. The rationale for this policy is to preclude extradition of a person whose prosecution in the United States would offend our domestic statutes of limitations (supposing the criminal conduct had occurred here). *See Extradition of Ramos Herrera*, 268 F.Supp.2d at 697–98. At this stage, then, the court must consider specific calculations of the limitations periods.

Looking to the detailed calculations provided by the Mexican government, the prosecution for *homicidio* will not become time-barred until June 8, 2011, and the prosecution for *homicidio en grado de tentativa* will not become time-barred until February 8, 2009. (*See* Docket Entry # 11, Formal Extradition Request, at Tab # 17.) Under Articles 12.01, 12.03 of the Texas Code of Criminal Procedure, there exists no time limitation on murder and attempted murder prosecutions. Accordingly, this extradition request has clearly been timely brought.

## C. Does the evidence justify commitment for trial?

■ In accordance with Article 3 of the treaty, the court may grant the extradition request only if the evidence is found sufficient, under the laws of the United States, to justify the committal for trial. 31 U.S.T. 5059, art. 3. This, in turn, requires a finding of probable cause. *See, e.g., Extradition of Contreras*, 800 F.Supp. 1462, 1464 (S.D.Tex.1992) (regarding Mexican extradition request). The law thus requires evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of Respondent's guilt. *Id.*

■ It must be noted that the probable cause hearing in extradition matters is comparable to a preliminary hearing (*i.e.,* it is not for finally determining whether the accused is guilty or innocent). *Extradition of Contreras*, 800 F.Supp. at 1464. At the hearing, the typical rules of evidence and of criminal procedure do not apply, which, procedurally, appears to make for a broad hearing. *Id.* Substantively, however, the scope of the hearing is very limited as to matters raised by Respondent. *See id.*

■ Evidence explaining away or completely rebutting the existence of probable cause appears to be the only admissible evidence which Respondent can present. *Extradition of Contreras*, 800 F.Supp. at 1464. If Respondent's evidence merely controverts the government's probable cause evidence, or raises a defense, then it is to be excluded. *See id.* The court bears in mind that the instant case is not a trial on the merits of the underlying criminal allegations.

■ In deciding whether probable cause supports the extradition request in the case at bar, the court first examines the issue of Respondent's identification by eyewitnesses to the crime, since that evidence would, at first blush, seem to be most compelling. It is borne in mind at this juncture that strict rules of evidence

are not applicable in international extradition proceedings. *See* 31A *Am.Jur.2d Extradition* § 104. Further, no rule exists specifying which identification procedures are "competent" for use in extradition proceedings, and such evidence need not be rejected merely because United States procedures governing the admissibility of an identification at trial were not followed. *Id.*

The most compelling probable cause evidence consists of the following:

- Within hours after the shooting occurred, Verástegui–Ostos made a sworn statement to Mexican authorities wherein he affirmed that Respondent had been an acquaintance prior to the shooting, and he positively identified Respondent as the gun-wielding person who had attacked Verástegui–Ostos and his deceased cousin, Alanís–Ostos, near D'Morados. (*See* Docket Entry #11, Formal Extradition Request, at Tab #12.)

- Also within hours after the shooting occurred, José Luis Hernández Rodríguez made a sworn statement to Mexican authorities wherein he affirmed having personally observed that the gun-wielding attacker of Verástegui–Ostos and Alanís–Ostos had been a D'Morados patron whom he had heard other bar patrons refer to as "Nava" on the night/morning in question.[21] (*See* Docket Entry #11, Formal Extradition Request, at Tab #12.)

Further, there seems to be no question (and this matter was testified to by a witness called by Respondent at his extradition hearing) that Respondent had been physically beaten by at least four individuals prior to the shooting. (Electronic Recording of Hearing of October 15, 2003.) These matters, standing alone (and without regard to the other evidence in the record which Respondent has suggested is unreliable as the result of impermissibly suggestive identification techniques), would be enough to establish probable case.[22]

To recapitulate, then, the following picture emerges from the totality of the reliable evidence:

- On the night of June 5, 1999, Respondent was on a date at a wedding reception and later at a bar.[23]

- At around 3:00 a.m. or so on June 6, 1999, Respondent was involved in a brawl outside of the bar, the particularly humiliating aspect of which was the fact that Respondent was beaten by at least four guys.[24]

---

21. Of course, hearsay is permitted in extradition proceedings. *Escobedo v. United States,* 623 F.2d 1098, 1102 n. 10 (5th Cir.1980), *cert. denied* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980), and *cert. denied,* 450 U.S. 922, 101 S.Ct. 1371, 67 L.Ed.2d 350 (1981) (concerning Mexican extradition requests).

22. The court recognizes the potential hazards of relying on eyewitness identification unaccompanied by corroborating forensic evidence. *See generally Extradition of Cervantes Valles,* 268 F.Supp.2d 758 (S.D.Tex.2003). However, in this case, the identification of Respondent made by eyewitnesses to the crime merely hours after it had occurred seems unassailable.

23. It seems logical and fair to assume that Respondent became intoxicated during the course of the evening, and consequently would not have been in possession of his keenest sense of judgment.

24. Furthermore, there is some suggestion in the record that the men who beat up Respondent also urinated on him. (Electronic Recording of Hearing of October 15, 2003.) The clear implication is that Respondent must have been pretty angry at this point. Further, there can be no question that he had ready access to firearms, given the fact that he was employed as a federal police officer.

- Eyewitnesses saw Respondent leave the bar, returning shortly thereafter with a handgun with which he began shooting.

It is abundantly clear that probable cause surely exists in this case.

In his attempt to counter the significant evidence against him, Respondent seems to rely on some variant of the following rather strained syllogism:

- Various individuals involved in the early-morning barroom brawl were university students, and at least one of them studied at *UAT*.

- It is well-known that *UAT* has been plagued by ruffianism, or *porrismo*.

- Therefore, the shooting incident must have been the work of *porros* (or ruffians) who conspired to wrongly accuse Respondent for their deeds.[25]

Having thoroughly reviewed the record, the court finds that Respondent's theory of a conspiracy masterminded by mostly anonymous *porros* to wrongly accuse him of the early-morning attack to be highly implausible, but the final resolution of such issues will be left to the Mexican judicial system.[26] By no means does Respondent's evidence detract from the finding of probable cause.

## D. Issues Related to Respondent's Nationality

As previously noted, Respondent has contended in this litigation that his claimed status as a citizen or national of the United States of America should stand in the way of extradition to Mexico.[27] (*See* Docket Entry # 20.) The court notes that, axiomatically, in the absence of an extradition treaty, nations are under no obligation to surrender those in their country to for-

25. Needless to say, Respondent does not have a viable theory regarding who, in his opinion, was the actual gunman. While the evidence developed by Respondent suggests that some of the decedent's friends were *porros*, this does not really explain how this would have caused the death of Alanís–Ostos.

26. Additionally, the potentially life-threatening risks which Respondent may face as an ex-policeman in Mexico are properly addressed to the executive branch. *Escobedo v. United States*, 623 F.2d 1098, 1102 n. 10 (5th Cir.1980), *cert. denied* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980), and *cert. denied*, 450 U.S. 922, 101 S.Ct. 1371, 67 L.Ed.2d 350 (1981) (concerning Mexican extradition requests). Such issues may be urged upon the Secretary of State, to whom the certificate of extraditability is being issued.

27. Again, the court notes that Respondent has produced a copy of a Texas birth certificate which indicates that he was born in Cameron County, Texas on February 9, 1971. (Docket Entry # 20, Exhibit # 2.) Yet, the Mexican government has supplied a copy of a Mexican birth certificate which indicates that Respon-

dent was born in Ciudad Victoria, Tamaulipas on January 6, 1971. (Docket Entry # 11, Formal Extradition Request, at Tab # 15.) In view of the fact that Respondent used the date of January 6, 1971 (the date from the Mexican birth certificate) as his date of birth for official records related to his employment as a police officer in Mexico, the court is willing to accept the Mexican birth certificate as the legitimate document as between the two. (*See* Docket Entry # 11, Formal Extradition Request, at Tab # 14.) Unfortunately, it seems, Texas birth certificates can be fraudulently obtained in this part of the country. *See generally News Release, U.S. Attorney for the Central District of Illinois, Eight Defendants Indicted in Identification Documents Fraud Scheme* (July 24, 2003), available online at: *http://www.usdoj.gov/usao/ilc/press/2003/July/072403idfraud.html* (last accessed December 8, 2003) (regarding birth certificate fraud in the McAllen, Texas area); Claire Osborn, *State Statistics Clerk is Accused of Creating Phony Birth Records, Austin American–Statesman*, August 9, 2002, 2002 WL 24075976; *Judge Gives Probation in False Documents Case, Fort Worth Star–Telegram*, May 14, 2001, 2001 WL 5150340.

eign authorities for prosecution.[28] *United States v. Alvarez–Machain,* 504 U.S. 655, 664, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) (concerning Mexican national). Yet, in the case at bar, the applicable extradition treaty and federal statutory law supply the necessary technicalities. 31 U.S.T. 5059, art. 9; 18 U.S.C. § 3196.

Assuming for the sake of argument that Respondent is a citizen or national of the United States of America, pursuant to Article 9 of the treaty, the executive authority of this country may deliver Respondent for extradition to Mexico if it be deemed proper to do so. 31 U.S.T. 5059, art. 9 § 1. Extradition appears proper, since the other requirements of the treaty have been met. 18 U.S.C. § 3196. Therefore, regardless of Respondent's true citizenship or nationality, extradition is wholly warranted based on the evidentiary showing made by the Mexican government.

### IV. Certificate of Extraditability

Having determined that the evidence proffered by the United Mexican States is sufficient to sustain the charges in accordance with the applicable legal standards, the court determines that the present extradition request should be GRANTED in all things, and the undersigned hereby CERTIFIES the same to the Secretary of State of the United States of America. (Docket Entries # 1, 11.). 18 U.S.C. § 3184. Respondent shall remain in the custody of the United States Marshal and confined in a proper facility until surrender is made to a duly qualified agent of the United Mexican States, or until further order from this court or from the Secretary of State of the United States of America. The United States Attorney shall ensure that this matter is timely brought to the attention of the appropriate govern-

mental authorities of both the United States of America and the United Mexican States. *See* 31 U.S.T. 5059, art. 13 § 2.

### V. Notice

The court clerk shall deliver a copy of this memorandum to counsel by facsimile and certified mail. The court clerk shall also send a copy of this memorandum by certified mail to:

● Colin L. Powell, Secretary of State, 2201 C. Street, NW, Washington, D.C. 20520; and

● Ambassador Juan José Bremer Martino, Embassy of Mexico, 1911 Pennsylvania Avenue NW, Washington, D.C. 20006.

---

**28.** Notwithstanding Respondent's contentions and documentation, the court is not convinced that Respondent is, in fact, legitimately a citizen or national of the United States of America.